## ALYESKA PIPELINE SERVICE CO. *v.* WILDERNESS SOCIETY ET AL.

No. 73-1977. Argued January 22, 1975—Decided May 12, 1975

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, and REHNQUIST, JJ., joined. BRENNAN, J., *post,* p. 271, and MARSHALL, J., *post,* p. 272, filed dissenting opinions. DOUGLAS and POWELL, JJ., took no part in the consideration or decision of the case.

*Robert E. Jordan III* argued the cause for petitioner. With him on the brief were *Paul F. Mickey, James H. Pipkin, Jr.,* and *John D. Knodell, Jr.*

*Dennis J. Flannery* argued the cause for respondents. With him on the brief were *Joseph Onek, John F. Dienelt,* and *Thomas B. Stoel, Jr.**

---

*Briefs of *amici curiae* urging affirmance were filed by *June Resnick German, Haynes N. Johnson,* and *Nicholas A. Robinson* for the Association of the Bar of the City of New York; by *Armand Derfner, Albert E. Jenner, Jr., Nicholas deB. Katzenbach, Elliot L. Richardson, Bernard G. Segal, Whitney North Seymour, E. Barrett Prettyman, Jr., David S. Tatel, J. Harold Flannery,* and *Paul Dimond* for the Lawyers' Committee for Civil Rights Under Law; by

MR. JUSTICE WHITE delivered the opinion of the Court.

This litigation was initiated by respondents Wilderness Society, Environmental Defense Fund, Inc., and Friends of the Earth in an attempt to prevent the issuance of permits by the Secretary of the Interior which were required for the construction of the trans-Alaska oil pipeline. The Court of Appeals awarded attorneys' fees to respondents against petitioner Alyeska Pipeline Service Co. based upon the court's equitable powers and the theory that respondents were entitled to fees because they were performing the services of a "private attorney general." Certiorari was granted, 419 U. S. 823 (1974), to determine whether this award of attorneys' fees was appropriate. We reverse.

I

A major oil field was discovered in the North Slope of Alaska in 1968.[1] In June 1969, the oil companies constituting the consortium owning Alyeska[2] submitted an

---

*Jack Greenberg, James M. Nabrit III, Eric Schnapper,* and *Charles Stephen Ralston* for the NAACP Legal Defense and Educational Fund, Inc.; and by *Henry Geller* and *Abraham S. Goldstein* for the Center for Law in the Public Interest.

[1] For a discussion and chronology of the events surrounding this litigation, see Dominick & Brody, The Alaska Pipeline: *Wilderness Society* v. *Morton* and the Trans-Alaska Pipeline Authorization Act, 23 Am. U. L. Rev. 337 (1973).

[2] In 1968, Atlantic Richfield Co., Humble Oil & Refining Co., and British Petroleum Corp. formed the Trans-Alaska Pipeline System, and it was this entity which submitted the applications for the permits. Federal Task Force on Alaskan Oil Development: A Preliminary Report to the President (1969), in App. 80; Dominick & Brody, *supra,* n. 1, at 337–338, n. 3. In 1970, the Trans-Alaska Pipeline System was replaced by petitioner Alyeska. Alyeska's stock is owned by ARCO Pipeline Co., Sohio Pipeline Co., Humble Pipeline Co., Mobil Pipeline Co., Phillips Petroleum Co., Amerada Hess

application to the Department of the Interior for rights-of-way for a pipeline that would transport oil from the North Slope across land in Alaska owned by the United States,[3] a major part of the transport system which would carry the oil to its ultimate markets in the lower 48 States. A special interdepartmental task force studied the proposal and reported to the President. Federal Task Force on Alaskan Oil Development: A Preliminary Report to the President (1969), in App. 78–89. An amended application was submitted in December 1969, which requested a 54-foot right-of-way, along with applications for "special land use permits" asking for additional space alongside the right-of-way and for the construction of a road along one segment of the pipeline.[4]

Respondents brought this suit in March 1970, and sought declaratory and injunctive relief against the Secretary of the Interior on the grounds that he intended to issue the right-of-way and special land-use permits in violation of § 28 of the Mineral Leasing Act of 1920, 41 Stat. 449, as amended, 30 U. S. C. § 185,[5] and without

Corp., and Union Oil Co. of California. See *id.*, at 338 n. 3; App. 105.

[3] The application requested a primary right-of-way of 54 feet, an additional parallel, adjacent right-of-way for construction purposes of 46 feet, and another right-of-way of 100 feet for a construction road between Prudhoe Bay on the North Slope to the town of Livengood, a distance slightly less than half the length of the proposed pipeline. See *Wilderness Society* v. *Morton*, 156 U. S. App. D. C. 121, 128, 479 F. 2d 842, 849 (1973).

[4] The amended application asked for a single 54-foot right-of-way, a special land-use permit for an additional 11 feet on one side and 35 feet on the other side of the right-of-way, and another special land-use permit for a space 200 feet in width between Prudhoe Bay and Livengood. *Id.*, at 128–129, 479 F. 2d, at 849–850; App. 89–98.

[5] Title 30 U. S. C. § 185 provided in pertinent part:

"Rights-of-way through the public lands, including the forest reserves of the United States, may be granted by the Secretary of the

compliance with the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U. S. C. § 4321 *et seq.*[6] On the basis of both the Mineral Leasing Act and the NEPA, the District Court granted a preliminary injunction against issuance of the right-of-way and permits. 325 F. Supp. 422 (DC 1970).

Subsequently the State of Alaska and petitioner Alyeska were allowed to intervene.[7] On March 20, 1972, the Interior Department released a six-volume Environmental Impact Statement and a three-volume Economic

---

Interior for pipe-line purposes for the transportation of oil or natural gas to any applicant possessing the [prescribed] qualifications . . . to the extent of the ground occupied by the said pipe line and twenty-five feet on each side of the same under such regulations and conditions as to survey, location, application, and use as may be prescribed by the Secretary of the Interior and upon the express condition that such pipe lines shall be constructed, operated, and maintained as common carriers and shall accept, convey, transport, or purchase without discrimination, oil or natural gas produced from Government lands in the vicinity of the pipe line in such proportionate amounts as the Secretary of the Interior may, after a full hearing with due notice thereof to the interested parties and a proper finding of facts, determine to be reasonable: . . . *Provided further,* That no right-of-way shall hereafter be granted over said lands for the transportation of oil or natural gas except under and subject to the provisions, limitations, and conditions of this section. Failure to comply with the provisions of this section or the regulations and conditions prescribed by the Secretary of the Interior shall be ground for forfeiture of the grant by the United States district court for the district in which the property, or some part thereof, is located in an appropriate proceeding."

[6] The Court of Appeals described the heart of respondents' NEPA contention to be that the Secretary did not adequately consider the alternative of a trans-Canada pipeline. 156 U. S. App. D. C., at 166–168, 479 F. 2d, at 887–889.

[7] The interventions occurred in September 1971, approximately 17 months after the District Court had granted the preliminary injunction preventing issuance of the right-of-way and permits by the Secretary.

and Security Analysis.[8]   After a period of time set aside
for public comment, the Secretary announced that the
requested permits would be granted to Alyeska.   App.
105–138.   Both the Mineral Leasing Act and the NEPA
issues were at that point fully briefed and argued before
the District Court.   That court then decided to dissolve
the preliminary injunction, to deny the permanent injunc-
tion, and to dismiss the complaint.[9]

Upon appeal, the Court of Appeals for the District of
Columbia Circuit reversed, basing its decision solely on
the Mineral Leasing Act.   156 U. S. App. D. C. 121, 479
F. 2d 842 (1973) (en banc).   Finding that the NEPA
issues were very complex and important, that deciding
them was not necessary at that time since pipeline con-
struction would be enjoined as a result of the violation
of the Mineral Leasing Act, that they involved issues of
fact still in dispute, and that it was desirable to expedite
its decision as much as possible, the Court of Appeals
declined to decide the merits of respondents' NEPA con-
tentions which had been rejected by the District Court.[10]
Certiorari was denied here.   411 U. S. 917 (1973).

Congress then enacted legislation which amended the
Mineral Leasing Act to allow the granting of the permits
sought by Alyeska [11] and declared that no further action

---

[8] The Department of the Interior had released a draft impact
statement in January 1971.

[9] The decision is not reported.   See *id.*, at 130, 479 F. 2d, at 851.

[10] At the same time, the Court of Appeals upheld the grant of
certain rights-of-way to the State of Alaska.   *Id.*, at 158–163, 479
F. 2d, at 879–884.   It also considered a challenge to a special land-
use permit issued by the Forest Supervisor to Alyeska's predecessor,
but did not find the issue ripe for adjudication.   *Id.*, at 163–166, 479
F. 2d, at 884–887.

[11] Pub. L. 93–153, Tit. I, § 101, 87 Stat. 576, 30 U. S. C. § 185
(1970 ed., Supp. III).

under the NEPA was necessary before construction of the pipeline could proceed.[12]

With the merits of the litigation effectively terminated by this legislation, the Court of Appeals turned to the questions involved in respondents' request for an award of attorneys' fees.[13]  161 U. S. App. D. C. 446, 495 F. 2d 1026 (1974) (en banc).  Since there was no applicable statutory authorization for such an award, the court proceeded to consider whether the requested fee award fell within any of the exceptions to the general "American rule" that the prevailing party may not recover attorneys' fees as costs or otherwise.  The exception for an award against a party who had acted in bad faith was inapposite, since the position taken by the federal and state parties and Alyeska "was manifestly reasonable and assumed in good faith . . . ."  *Id.*, at 449, 495 F. 2d, at 1029.  Application of the "common benefit" exception which spreads the cost of litigation to those persons benefiting from it would "stretch it totally outside its basic rationale . . . ."  *Ibid.*[14]  The Court of Appeals nevertheless held that respondents had acted to vindicate "important statutory rights of all citizens . . . ," *id.*, at 452, 495 F. 2d, at 1032; had ensured that the governmental system functioned properly; and were entitled to attorneys' fees lest the great cost of litigation of this kind, particularly against well-financed defendants such as

---

[12] Trans-Alaska Pipeline Authorization Act, Pub. L. 93–153, Tit. II, 87 Stat. 584, 43 U. S. C. § 1651 *et seq.* (1970 ed., Supp. III).

[13] Respondents' bill of costs includes a total of 4,455 hours of attorneys' time spent on the litigation.  App. 209–219.

[14] "[T]his litigation may well have provided substantial benefits to particular individuals and, indeed, to every citizen's interest in the proper functioning of our system of government.  But imposing attorneys' fees on Alyeska will not operate to spread the costs of litigation proportionately among these beneficiaries . . . ." 161 U. S. App. D. C., at 449, 495 F. 2d, at 1029.

Alyeska, deter private parties desiring to see the laws protecting the environment properly enforced. Title 28 U. S. C. § 2412[15] was thought to bar taxing any attorneys' fees against the United States, and it was also deemed inappropriate to burden the State of Alaska with any part of the award.[16]  But Alyeska, the Court of Appeals held, could fairly be required to pay one-half of the full award to which respondents were entitled for having performed the functions of a private attorney general.  Observing that "[t]he fee should represent the reasonable value of the services rendered, taking into account all the surrounding circumstances, including, but not limited to, the time and labor required on the case, the benefit to the public, the skill demanded by the novelty or complexity of the issues, and the incentive factor," 161 U. S. App. D. C., at 456, 495 F. 2d, at 1036, the Court of Appeals remanded the case to the District Court for assessment of the dollar amount of the award.[17]

---

[15] See n. 40, *infra.*

[16] "In the circumstances of this case it would be inappropriate to tax fees against appellee State of Alaska.  The State voluntarily participated in this suit, in effect to present to the court a different version of the public interest implications of the trans-Alaska pipeline.  Taxing attorneys' fees against Alaska would in our view undermine rather than further the goal of ensuring adequate spokesmen for public interests."  161 U. S. App. D. C., at 456 n. 8, 495 F. 2d, at 1036 n. 8.

[17] The Court of Appeals also directed that "[t]he fee award need not be limited . . . to the amount actually paid or owed by [respondents].  It may well be that counsel serve organizations like [respondents] for compensation below that obtainable in the market because they believe the organizations further a public interest.  Litigation of this sort should not have to rely on the charity of counsel any more than it should rely on the charity of parties volunteering to serve as private attorneys general.  The attorneys who worked on this case should be reimbursed the reasonable value of

## II

In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser. We are asked to fashion a far-reaching exception to this "American Rule"; but having considered its origin and development, we are convinced that it would be inappropriate for the Judiciary, without legislative guidance, to reallocate the burdens of litigation in the manner and to the extent urged by respondents and approved by the Court of Appeals.

At common law, costs were not allowed; but for centuries in England there has been statutory authorization to award costs, including attorneys' fees. Although the matter is in the discretion of the court, counsel fees are regularly allowed to the prevailing party.[18]

During the first years of the federal-court system, Congress provided through legislation that the federal courts were to follow the practice with respect to awarding

their services, despite the absence of any obligation on the part of [respondents] to pay attorneys' fees." *Id.*, at 457, 495 F. 2d, at 1037.

[18] "As early as 1278, the courts of England were authorized to award counsel fees to successful plaintiffs in litigation. Similarly, since 1607 English courts have been empowered to award counsel fees to defendants in all actions where such awards might be made to plaintiffs. Rules governing administration of these and related provisions have developed over the years. It is now customary in England, after litigation of substantive claims has terminated, to conduct separate hearings before special 'taxing Masters' in order to determine the appropriateness and the size of an award of counsel fees. To prevent the ancillary proceedings from becoming unduly protracted and burdensome, fees which may be included in an award are usually prescribed, even including the amounts that may be recovered for letters drafted on behalf of a client." *Fleischmann Distilling Corp.* v. *Maier Brewing Co.*, 386 U. S. 714, 717 (1967) (footnotes omitted). See generally Goodhart, Costs, 38 Yale L. J. 849 (1929); C. McCormick, Law of Damages 234–236 (1935).

attorneys' fees of the courts of the States in which the federal courts were located,[19] with the exception of district courts under admiralty and maritime jurisdiction

[19] The Federal Judiciary Act of Sept. 24, 1789, 1 Stat. 73, touched upon costs in §§ 9, 11–12, 20–23, but as to counsel fees provided specifically only that the United States Attorney in each district "shall receive as a compensation for his services such fees as shall be taxed therefor in the respective courts before which the suits or prosecutions shall be." § 35. Five days later, however, Congress enacted legislation regulating federal-court processes, which provided:

"That until further provision shall be made, and except where by this act or other statutes of the United States is otherwise provided . . . rates of fees, except fees to judges, in the circuit and district courts, in suits at common law, shall be the same in each state respectively as are now used or allowed in the supreme courts of the same. And . . . [in causes of equity and of admiralty and maritime jurisdiction] the rates of fees [shall be] the same as are or were last allowed by the states respectively in the court exercising supreme jurisdiction in such causes." Act of Sept. 29, 1789, § 2, 1 Stat. 93.

That legislation was to be in effect only until the end of the next congressional session, § 3, but it was extended twice. See Act of May 26, 1790, c. 13, 1 Stat. 123; Act of Feb. 18, 1791, c. 8, 1 Stat. 191. It was repealed, however, by legislation enacted on May 8, 1792, § 8, 1 Stat. 278.

Prior to the time of that repeal, other legislation had been passed providing for additional compensation for United States Attorneys to cover traveling expenses. Act of Mar. 3, 1791, c. 22, § 1, 1 Stat. 216. That legislation was also repealed by the Act of May 8, 1792, *supra.* The latter enactment substituted a new provision for the compensation of United States Attorneys; they would be entitled to "such fees in each state respectively as are allowed in the supreme courts of the same . . ." plus certain traveling expenses, § 3, 1 Stat. 277. That provision was repealed on February 28, 1799. § 9, 1 Stat. 626. That same statute provided new, specific rates of compensation for United States Attorneys. See § 4. See also § 5.

On March 1, 1793, Congress enacted a general provision governing the awarding of costs to prevailing parties in federal courts:

"That there be allowed and taxed in the supreme, circuit and district courts of the United States, in favour of the parties obtaining judg-

which were to follow a specific fee schedule.[20]   Those statutes, by 1800, had either expired or been repealed.

In 1796, this Court appears to have ruled that the Judiciary itself would not create a general rule, independent of any statute, allowing awards of attorneys' fees in federal courts.   In *Arcambel* v. *Wiseman,* 3 Dall. 306, the inclusion of attorneys' fees as damages [21] was overturned on the ground that "[t]he general practice of the *United States* is in oposition [*sic*] to it; and even if that practice

---

ments therein, such compensation for their travel and attendance, and for attornies and counsellors' fees, except in the district courts in cases of admiralty and maritime jurisdiction, as are allowed in the supreme or superior courts of the respective states." § 4, 1 Stat. 333.

This provision was to be in force for one year and then to the end of the next session of Congress, § 5, but it was continued in effect in 1795, Act of Feb. 25, 1795, c. 28, 1 Stat. 419, and again in 1796, Act of Mar. 31, 1796, 1 Stat. 451, for a period of two years and then until the end of the next session of Congress; at that point, it expired.

After 1799 and until 1853, no other congressional legislation dealt with the awarding of attorneys' fees in federal courts except for the Act of 1842, n. 23, *infra,* which gave this Court authority to prescribe taxable attorneys' fees, and for legislation dealing with the compensation for United States Attorneys. See the Act of Mar. 3, 1841, 5 Stat. 427, and the Act of May 18, 1842, 5 Stat. 483. See the summary of the legislation dealing with costs throughout this period, in S. Law, The Jurisdiction and Powers of the United States Courts 255–282 (1852).

[20] By the legislation of September 29, 1789, the federal courts were to follow the state practice with respect to rates of fees under admiralty and maritime jurisdiction. See n. 19, *supra.* The Act of Mar. 1, 1793, § 1, 1 Stat. 332, established set fees for attorneys in the district courts in admiralty and maritime proceedings. As with § 4 of that Act, n. 19, *supra,* this provision had expired by the end of the century. See *The Baltimore,* 8 Wall. 377, 390–392 (1869).

[21] The Circuit Court had allowed $1,600 in counsel fees under its estimate of damages and $28.89 as costs. Record in *Arcambel* 56.

250

were not strictly correct in principle, it is entitled to the respect of the court, till it is changed, or modified, by statute." This Court has consistently adhered to that early holding. See *Day* v. *Woodworth,* 13 How. 363 (1852); *Oelrichs* v. *Spain,* 15 Wall. 211 (1872); *Flanders* v. *Tweed,* 15 Wall. 450 (1873); *Stewart* v. *Sonneborn,* 98 U. S. 187 (1879); *Fleischmann Distilling Corp.* v. *Maier Brewing Co.,* 386 U. S. 714, 717–718 (1967); *F. D. Rich Co., Inc.* v. *United States ex rel. Industrial Lumber Co., Inc.,* 417 U. S. 116, 126–131 (1974).

The practice after 1799 and until 1853 continued as before, that is, with the federal courts referring to the state rules governing awards of counsel fees, although the express legislative authorization for that practice had expired.[22] By legislation in 1842, Congress did give this Court authority to prescribe the items and amounts of costs which could be taxed in federal courts, but the Court took no action under this statutory mandate.[23]

[22] See 2 T. Street, Federal Equity Practice § 1986, pp. 1188–1189 (1909); Law, *supra,* n. 19, at 279; Costs in Civil Cases, 30 F. Cas. 1058 (No. 18,284) (CCSDNY 1852).

[23] "That, for the purpose of further diminishing the costs and expenses in suits and proceedings in the said courts, the Supreme Court shall have full power and authority, from time to time, to make and prescribe regulations to the said district and circuit courts, as to the taxation and payment of costs in all suits and proceedings therein; and to make and prescribe a table of the various items of costs which shall be taxable and allowed in all suits, to the parties, their attorneys, solicitors, and proctors, to the clerk of the court, to the marshal of the district, and his deputies, and other officers serving process, to witnesses, and to all other persons whose services are usually taxable in bills of costs. And the items so stated in the said table, and none others, shall be taxable or allowed in bills of costs; and they shall be fixed as low as they reasonably can be, with a due regard to the nature of the duties and services which shall be performed by the various officers and persons aforesaid, and shall in no case exceed the costs and expenses now authorized, where the

See S. Law, The Jurisdiction and Powers of the United States Courts 271 n. 1 (1852).

In 1853, Congress undertook to standardize the costs allowable in federal litigation. In support of the proposed legislation, it was asserted that there was great diversity in practice among the courts and that losing litigants were being unfairly saddled with exorbitant fees for the victor's attorney.[24] The result was a far-reaching

same are provided for by existing laws." Act of Aug. 23, 1842, § 7, 5 Stat. 518.

The brief legislative history of this section indicates that, as its own language states, its purpose was to reduce fee-bills in federal courts. Cong. Globe, 27th Cong., 2d Sess., 723 (1842) (remarks of Sen. Berrien). One of its opponents, Senator Buchanan, said the following:

"If Congress conforms the fee-bills of the courts over which it has control, to the fee-bills of the State courts, that is all that can be expected of it . . . . But the great and main objection was, its transfer of the legislative power of Congress to the Supreme Court." *Ibid.*

[24] See the remarks of Senator Bradbury, Cong. Globe App., 32d Cong., 2d Sess., 207 (1853):

"There is now no uniform rule either for compensating the ministerial officers of the courts, or for the regulation of the costs in actions between private suitors. One system prevails in one district, and a totally different one in another; and in some cases it would be difficult to ascertain that any attention had been paid to any law whatever designed to regulate such proceedings. . . . It will hence be seen that the compensation of the officers, and the costs taxed in civil suits, is made to depend in a great degree on that allowed in the State courts. There are no two States where the allowance is the same.

"When this system was adopted, it had the semblance of equality, which does not now exist. There were then but sixteen States, in all of which the laws prescribed certain taxable costs to attorneys for the prosecution and defense of suits. In several of the States which have since been added to the Union, no such cost is allowed; and in others the amount is inconsiderable. As the State fee bills are made so far the rule of compensation in the Federal courts, the Senate will

Act specifying in detail the nature and amount of the taxable items of cost in the federal courts. One of its purposes was to limit allowances for attorneys' fees that were to be charged to the losing parties. Although the Act disclaimed any intention to limit the amount of fees that an attorney and his client might agree upon between themselves, counsel fees collectible from the losing party were expressly limited to the amounts stated in the Act:

> "That in lieu of the compensation now allowed by law to attorneys, solicitors, and proctors in the United States courts, to United States district attorneys, clerks of the district and circuit courts, marshals, witnesses, jurors, commissioners, and printers, in the several States, the following and no other compensation shall be taxed and allowed. But this act shall not be construed to prohibit attorneys, solicitors, and proctors from charging to and receiving from their clients, other than the Government,

---

perceive that totally different systems of taxation prevail in the different districts. . . . It is not only the officers of the courts, but the suitors also, that are affected by the present unequal, extravagant, and often oppressive system.

.      .      .      .      .

"The abuses that have grown up in the taxation of attorneys' fees which the losing party has been compelled to pay in civil suits, have been a matter of serious complaint. The papers before the committee show that in some cases those costs have been swelled to an amount exceedingly oppressive to suitors, and altogether disproportionate to the magnitude and importance of the causes in which they are taxed, or the labor bestowed. . . .

.      .      .      .      .

"It is to correct the evils and remedy the defects of the present system, that the bill has been prepared and passed by the House of Representatives. It attempts to simplify the taxation of fees, by prescribing a limited number of definite items to be allowed. . . ." See also H. R. Rep. No. 50, 32d Cong., 1st Sess. (1852); 2 Street, *supra*, n. 22, § 1987, p. 1189.

such reasonable compensation for their services, in addition to the taxable costs, as may be in accordance with general usage in their respective States, or may be agreed upon between the parties." Act of Feb. 26, 1853, 10 Stat. 161.

The Act then proceeds to list specific sums for the services of attorneys, solicitors, and proctors.[25]

The intention of the Act to control the attorneys' fees recoverable by the prevailing party from the loser was repeatedly enforced by this Court. In *The Baltimore*, 8 Wall. 377 (1869), a $500 allowance for counsel was set aside, the Court reviewing the history of costs in the United States courts and concluding:

"Fees and costs, allowed to the officers therein named, are now regulated by the act of the 26th of February, 1853, which provides, in its 1st section, that in lieu of the compensation now allowed by law to attorneys, solicitors, proctors, district attorneys, clerks, marshals, witnesses, jurors, commissioners, and printers, the following and no other compensation shall be allowed.

"Attorneys, solicitors, and proctors may charge their

---

[25] *Fees of Attorneys, Solicitors, and Proctors.* In a trial before a jury, in civil and criminal causes, or before referees, or on a final hearing in equity or admiralty, a docket fee of twenty dollars: *Provided,* That in cases in admiralty and maritime jurisdiction, where the libellant shall recover less than fifty dollars, the docket fee of his proctor shall be but ten dollars.

"In cases at law, where judgment is rendered without a jury, ten dollars, and five dollars where a cause is discontinued.

"For scire facias and other proceedings on recognizances, five dollars.

"For each deposition taken and admitted as evidence in the cause, two dollars and fifty cents.

"A compensation of five dollars shall be allowed for the services rendered in cases removed from a district to a circuit court by writ of error or appeal...." 10 Stat. 161–162.

clients reasonably for their services, in addition to the taxable costs, but nothing can be taxed as cost against the opposite party, as an incident to the judgment, for their services, except the costs and fees therein described and enumerated. They may tax a docket fee of twenty dollars on a final hearing in admiralty, if the libellant recovers fifty dollars, but if he recovers less than fifty dollars, the docket fee of the proctor shall be but ten dollars." *Id.*, at 392 (footnotes omitted).

In *Flanders* v. *Tweed,* 15 Wall. 450 (1872), a counsel's fee of $6,000 was included by the jury in the damages award. The Court held the Act forbade such allowances:

"Fees and costs allowed to officers therein named are now regulated by the act of Congress passed for that purpose, which provides in its first section, that, in lieu of the compensation previously allowed by law to attorneys, solicitors, proctors, district attorneys, clerks, marshals, witnesses, jurors, commissioners, and printers, the following and no other compensation shall be allowed. Attorneys, solicitors, and proctors may charge their clients reasonably for their services, in addition to the taxable costs, but nothing can be taxed or recovered as cost against the opposite party, as an incident to the judgment, for their services, except the costs and fees therein described and enumerated. They may tax a docket fee of twenty dollars in a trial before a jury, but they are restricted to a charge of ten dollars in cases at law, where judgment is rendered without a jury." *Id.*, at 452–453 (footnote omitted).

See also *In re Paschal,* 10 Wall. 483, 493–494 (1871).

Although, as will be seen, Congress has made specific provision for attorneys' fees under certain federal stat-

utes, it has not changed the general statutory rule that allowances for counsel fees are limited to the sums specified by the costs statute. The 1853 Act was carried forward in the Revised Statutes of 1874 [26] and by the Judicial Code of 1911.[27] Its substance, without any apparent intent to change the controlling rules, was also included in the Revised Code of 1948 as 28 U. S. C. §§ 1920 [28] and 1923 (a).[29] Under § 1920, a court may tax as costs the

---

[26] "The following and no other compensation shall be taxed and allowed to attorneys, solicitors, and proctors in the courts of the United States, to district attorneys, clerks of the circuit and district courts, marshals, commissioners, witnesses, jurors, and printers in the several States and Territories, except in cases otherwise expressly provided by law. But nothing herein shall be construed to prohibit attorneys, solicitors, and proctors from charging to and receiving from their clients, other than the Government, such reasonable compensation for their services, in addition to the taxable costs, as may be in accordance with general usage in their respective States, or may be agreed upon between the parties." Rev. Stat. § 823. For the schedule of fees, see § 824. The schedule remained the same as the one in the 1853 Act, n. 25, *supra*.

[27] Revised Stat. §§ 823 and 824 were not repealed by the Judicial Code of 1911 and hence were to "remain in force with the same effect and to the same extent as if this Act had not been passed." § 297, 36 Stat. 1169. When the Judicial Code was included under Title 28 of the United States Code in 1926, these sections appeared as §§ 571 and 572 with but minor changes in wording, including the deletion from the latter section of the compensation for services rendered in a case which went to the circuit court on appeal or writ of error.

[28] "A judge or clerk of any court of the United States may tax as costs the following:

. . . . .

"(5) Docket fees under section 1923 of this title." 28 U. S. C. § 1920 (1946 ed., Supp. II).

[29] "(a) Attorney's and proctor's docket fees in courts of the United States may be taxed as costs as follows:

"$20 on trial or final hearing in civil, criminal or admiralty cases,

various items specified, including the "docket fees" under § 1923 (a). That section provides that "[a]ttorney's and proctor's docket fees in courts of the United States may

except that in cases of admiralty and maritime jurisdiction where the libellant recovers less than $50 the proctor's docket fee shall be $10;

"$20 in admiralty appeals involving not over $1,000;

"$50 in admiralty appeals involving not over $5,000;

"$100 in admiralty appeals involving more than $5,000;

"$5 on discontinuance of a civil action;

"$5 on motion for judgment and other proceedings on recognizances;

"$2.50 for each deposition admitted in evidence." 28 U. S. C. § 1923 (a) (1946 ed., Supp. II).

The 1948 Code does not contain the language used in the 1853 Act and carried on for nearly 100 years that the fees prescribed by the statute "and no other compensation shall be taxed and allowed," but nothing in the 1948 Code indicates a congressional intention to depart from that rule. The Reviser's Note to the new § 1923 states only that the "[s]ection consolidates sections 571, 572, and 578 of title 28, U. S. C., 1940 ed." Section 571 was the provision limiting awards to the fees prescribed by § 572. See n. 27, *supra.* Our conclusion that the 1948 Code did not change the longstanding rule limiting awards of attorneys' fees to the statutorily provided amounts is consistent with our established view that "the function of the Revisers of the 1948 Code was generally limited to that of consolidation and codification. Consequently, a well-established principle governing the interpretation of provisions altered in the 1948 revision is that 'no change is to be presumed unless clearly expressed.'" *Tidewater Oil Co.* v. *United States,* 409 U. S. 151, 162 (1972) (footnote omitted). As MR. JUSTICE MARSHALL noted for the Court, *id.,* at 162 n. 29, the Senate Report covering the new Code observed that "great care has been exercised to make no changes in the existing law which would not meet with substantially unanimous approval." S. Rep. No. 1559, 80th Cong., 2d Sess., 2 (1948).

The Reviser's Note to § 1920 explains the shift from the mandatory "shall be taxed" to the discretionary "may be taxed" as made "in view of Rule 54 (d) of the Federal Rules of Civil Procedure, providing for allowance of costs to the prevailing party as of course 'unless the court otherwise directs.'" Note following 28 U. S. C. § 1920 (1946 ed., Supp. II).

be taxed as costs as follows . . . ." Against this background, this Court understandably declared in 1967 that with the exception of the small amounts allowed by § 1923, the rule "has long been that attorney's fees are not ordinarily recoverable . . . ." *Fleischmann Distilling Corp.*, 386 U. S., at 717. Other recent cases have also reaffirmed the general rule that, absent statute or enforceable contract, litigants pay their own attorneys' fees. See *F. D. Rich Co.*, 417 U. S., at 128–131; *Hall* v. *Cole*, 412 U. S. 1, 4 (1973).

To be sure, the fee statutes have been construed to allow, in limited circumstances, a reasonable attorneys' fee to the prevailing party in excess of the small sums permitted by § 1923. In *Trustees* v. *Greenough*, 105 U. S. 527 (1882), the 1853 Act was read as not interfering with the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or property itself or directly from the other parties enjoying the benefit.[30] That rule has been con-

---

[30] Mr. Justice Bradley, writing for the Court in *Greenough*, said the following of the 1853 Act:

"The fee-bill is intended to regulate only those fees and costs which are strictly chargeable as between party and party, and not to regulate the fees of counsel and other expenses and charges as between solicitor and client, nor the power of a court of equity, in cases of administration of funds under its control, to make such allowance to the parties out of the fund as justice and equity may require. The fee-bill itself expressly provides that it shall not be construed to prohibit attorneys, solicitors, and proctors from charging to and receiving from their clients (other than the government) such reasonable compensation for their services, in addition to the taxable costs, as may be in accordance with general usage in their respective States, or may be agreed upon between the parties. Act of Feb. 26, 1853, c. 80, 10 Stat. 161; Rev. Stat., sect. 823. And the act contains nothing which can be fairly construed to deprive the Court of

sistently followed. *Central Railroad & Banking Co.* v.
*Pettus,* 113 U. S. 116 (1885); *Harrison* v. *Perea,* 168 U. S.
311, 325–326 (1897); *United States* v. *Equitable Trust
Co.,* 283 U. S. 738 (1931); *Sprague* v. *Ticonic National
Bank,* 307 U. S. 161 (1939); *Mills* v. *Electric Auto-Lite
Co.,* 396 U. S. 375 (1970); *Hall* v. *Cole, supra;*
cf. *Hobbs* v. *McLean,* 117 U. S. 567, 581–582
(1886). See generally Dawson, Lawyers and Involuntary Clients: Attorney Fees From Funds, 87 Harv. L. Rev.
1597 (1974). Also, a court may assess attorneys' fees for
the "willful disobedience of a court order ... as part of the
fine to be levied on the defendant[,] *Toledo Scale Co.* v.
*Computing Scale Co.,* 261 U. S. 399, 426–428 (1923),"
*Fleischmann Distilling Corp.* v. *Maier Brewing Co., supra,*
at 718; or when the losing party has "acted in bad faith,

Chancery of its long-established control over the costs and charges
of the litigation, to be exercised as equity and justice may require,
including proper allowances to those who have instituted proceedings
for the benefit of a general fund." 105 U. S., at 535–536.

*Sprague* v. *Ticonic National Bank,* 307 U. S. 161, 165 n. 2 (1939),
might be read as suggesting that the Court in *Greenough* said
that a federal court could tax against the losing party "solicitor and
client" costs in excess of the amounts prescribed by the 1853 Act.
But any such suggestion is without support either in the opinion
in *Greenough,* which was limited to a common-fund rationale,
or in the express terms of the statute. Those costs were simply left
unregulated by the federal statute; it did not permit taxing the
"client-solicitor" costs against the client's adversary. See *The Baltimore,* 8 Wall. 377 (1869); *Flanders* v. *Tweed,* 15 Wall. 450 (1872);
1 R. Foster, Federal Practice §§ 328–330 (1901); A. Conkling, The
Organization, Jurisdiction and Practice of the Courts of the United
States 456–457 (5th ed. 1870); A. Boyce, A Manual of the Practice
in the Circuit Courts 72 (1869). Cf. *United States* v. *One Package
of Ready-Made Clothing,* 27 F. Cas. 310, 312 (No. 15,950) (CCSDNY
1853). MR. JUSTICE MARSHALL's reliance upon *Sprague* for the
proposition that "client-solicitor" costs could be taxed against the
client's opponent, see *post,* at 278–279, is thus misplaced and conflicts
with any fair reading of *Greenough, supra,* and the 1853 Act.

vexatiously, wantonly, or for oppressive reasons . . . ."
*F. D. Rich Co.,* 417 U. S., at 129 (citing *Vaughan
v. Atkinson,* 369 U. S. 527 (1962)); cf. *Universal Oil
Products Co.* v. *Root Refining Co.,* 328 U. S. 575, 580
(1946). These exceptions are unquestionably assertions
of inherent power in the courts to allow attorneys' fees in
particular situations, unless forbidden by Congress, but
none of the exceptions is involved here.[31]   The Court of

---

[31] A very different situation is presented when a federal court sits
in a diversity case. "[I]n an ordinary diversity case where the state
law does not run counter to a valid federal statute or rule of
court, and usually it will not, state law denying the right to attor-
ney's fees or giving a right thereto, which reflects a substantial policy
of the state, should be followed." 6 J. Moore, Federal Practice ¶ 54.77
[2], pp. 1712–1713 (2d ed. 1974) (footnotes omitted). See also
2 S. Speiser, Attorneys' Fees §§ 14:3, 14:4 (1973) (hereinafter
Speiser); Annotation, Prevailing Party's Right to Recover
Counsel Fees in Federal Courts, 8 L. Ed. 2d 894, 900–
901. Prior to the decision in *Erie R. Co.* v. *Tompkins,*
304 U. S. 64 (1938), this Court held that a state statute requiring an
award of attorneys' fees should be applied in a case removed from
the state courts to the federal courts: "[I]t is clear that it is the
policy of the state to allow plaintiffs to recover an attorney's fee
in certain cases, and it has made that policy effective by making the
allowance of the fee mandatory on its courts in those cases. It would
be at least anomalous if this policy could be thwarted and the right
so plainly given destroyed by removal of the cause to the federal
courts." *People of Sioux County* v. *National Surety Co.,* 276 U. S.
238, 243 (1928). The limitations on the awards of attorneys' fees
by federal courts deriving from the 1853 Act were found not to bar the
award. *Id.,* at 243–244. We see nothing after *Erie* requiring a
departure from this result. See *Hanna* v. *Plumer,* 380 U. S. 460,
467–468 (1965). The same would clearly hold for a judicially
created rule, although the question of the proper rule to govern in
awarding attorneys' fees in federal diversity cases in the absence
of state statutory authorization loses much of its practical sig-
nificance in light of the fact that most States follow the restrictive
American rule. See 1 Speiser §§ 12:3, 12:4.

Appeals expressly disclaimed reliance on any of them. See *supra,* at 245.

Congress has not repudiated the judicially fashioned exceptions to the general rule against allowing substantial attorneys' fees; but neither has it retracted, repealed, or modified the limitations on taxable fees contained in the 1853 statute and its successors.[32] Nor has it extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted. What Congress has done, however, while fully recognizing and accepting the general rule, is to make specific and explicit provisions for the allowance of attorneys' fees under selected statutes granting or protecting various federal rights.[33] These statu-

---

[32] See nn. 26–29, *supra.*

[33] See Amendments to Freedom of Information Act, Pub. L. 93–502, § 1 (b)(2), 88 Stat. 1561 (amending 5 U. S. C. § 552 (a)); Packers and Stockyards Act, 42 Stat. 166, 7 U. S. C. § 210 (f); Perishable Agricultural Commodities Act, 46 Stat. 535, 7 U. S. C. § 499g (b); Bankruptcy Act, 11 U. S. C. §§ 104 (a)(1), 641–644; Clayton Act, § 4, 38 Stat. 731, 15 U. S. C. § 15; Unfair Competition Act, 39 Stat. 798, 15 U. S. C. § 72; Securities Act of 1933, 48 Stat. 82, as amended, 48 Stat. 907, 15 U. S. C. § 77k (e); Trust Indenture Act, 53 Stat. 1176, 15 U. S. C. § 77www (a); Securities Exchange Act of 1934, 48 Stat. 890, 897, as amended, 15 U. S. C. §§ 78i (e), 78r (a); Truth in Lending Act, 82 Stat. 157, 15 U. S. C. § 1640 (a); Motor Vehicle Information and Cost Savings Act, Tit. IV, § 409 (a)(2), 86 Stat. 963, 15 U. S. C. § 1989 (a)(2) (1970 ed., Supp. II); 17 U. S. C. § 116 (copyrights); Organized Crime Control Act of 1970, 18 U. S. C. § 1964 (c); Education Amendments of 1972, § 718, 86 Stat. 369, 20 U. S. C. § 1617 (1970 ed., Supp. II); Norris-LaGuardia Act, § 7 (e), 47 Stat. 71, 29 U. S. C. § 107 (e); Fair Labor Standards Act, § 16 (b), 52 Stat. 1069, as amended, 29 U. S. C. § 216 (b); Longshoremen's and Harbor Workers' Compensation Act, § 28, 44 Stat. 1438, as amended, 86 Stat. 1259, 33 U. S. C. § 928 (1970 ed., Supp. II); Federal Water Pollution Control Act, § 505 (d), as added, 86 Stat. 888, 33 U. S. C. § 1365 (d) (1970 ed., Supp. II); Marine Protection, Research, and Sanctuaries Act of 1972, § 105 (g)(4), 33 U. S. C. § 1415 (g)(4) (1970 ed., Supp. II);

tory allowances are now available in a variety of circumstances, but they also differ considerably among themselves. Under the antitrust laws, for instance, allowance of attorneys' fees to a plaintiff awarded treble damages is mandatory.[34] In patent litigation, in contrast, "[t]he court in *exceptional* cases *may* award reasonable attorney fees to the prevailing party." 35 U. S. C. § 285 (emphasis added). Under Title II of the Civil Rights Act of 1964, 42 U. S. C. § 2000a–3 (b),[35] the pre-

---

35 U. S. C. § 285 (patent infringement); Servicemen's Readjustment Act, 38 U. S. C. § 1822 (b); Clean Air Act, § 304 (d), as added, 84 Stat. 1706, 42 U. S. C. § 1857h–2 (d); Civil Rights Act of 1964, Tit. II, § 204 (b), 78 Stat. 244, 42 U. S. C. § 2000a–3 (b), and Tit. VII, § 706 (k), 78 Stat. 261, 42 U. S. C. § 2000e–5 (k); Fair Housing Act of 1968, § 812 (c), 82 Stat. 88, 42 U. S. C. § 3612 (c); Noise Control Act of 1972, § 12 (d), 86 Stat. 1244, 42 U. S. C. § 4911 (d) (1970 ed., Supp. II); Railway Labor Act, § 3, 44 Stat. 578, as amended, 48 Stat. 1192, as amended, 45 U. S. C. § 153 (p); The Merchant Marine Act of 1936, § 810, 49 Stat. 2015, 46 U. S. C. § 1227; Communications Act of 1934, § 206, 48 Stat. 1072, 47 U. S. C. § 206; Interstate Commerce Act, §§ 8, 16 (2), 24 Stat. 382, 384, 49 U. S. C. §§ 8, 16 (2), and § 308 (b), as added, 54 Stat. 940, as amended, 49 U. S. C. § 908 (b); Fed. Rules Civ. Proc. 37 (a) and (c). See generally 1 Speiser §§ 12:61–12:71; Annotation, *supra*, n. 31, at 922–942.

[34] "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and *shall recover* threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U. S. C. § 15 (emphasis added).

Other statutes which are mandatory in terms of awarding attorneys' fees include the Fair Labor Standards Act, 29 U. S. C. § 216 (b); the Truth in Lending Act, 15 U. S. C. § 1640 (a); and the Merchant Marine Act of 1936, 46 U. S. C. § 1227.

[35] "In any action commenced pursuant to this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, and the United States shall be liable for costs the same as a private person."

Other statutory examples of discretion in awarding attorneys' fees

vailing party is entitled to attorneys' fees, at the discretion of the court, but we have held that Congress intended that the award should be made to the successful plaintiff absent exceptional circumstances. *Newman* v. *Piggie Park Enterprises, Inc.,* 390 U. S. 400, 402 (1968). See also *Northcross* v. *Board of Education of the Memphis City Schools,* 412 U. S. 427 (1973). Under this scheme of things, it is apparent that the circumstances under which attorneys' fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine.[36]

---

are the Securities Act of 1933, 15 U. S. C. § 77k (e); the Trust Indenture Act, 15 U. S. C. § 77www (a); the Securities Exchange Act of 1934, 15 U. S. C. §§ 78i (e), 78r (a); the Civil Rights Act of 1964, Tit. VII, 42 U. S. C. § 2000e–5 (k); the Clean Air Act, 42 U. S. C. § 1857h–2 (d); the Noise Control Act of 1972, 42 U. S. C. § 4911 (d) (1970 ed., Supp. II).

[36] Quite apart from the specific authorizations of fee shifting in particular statutes, Congress has recently confronted the question of the general availability of legal services to persons economically unable to retain a private attorney. See the Legal Services Corporation Act of 1974, Pub. L. 93–355, 88 Stat. 378, 42 U. S. C. § 2996 *et seq.* (1970 ed., Supp. IV). Section 1006 (f), 42 U. S. C. § 2996e (f) (1970 ed., Supp. IV), addresses one type of fee shifting:

"If an action is commenced by the Corporation or by a recipient and a final order is entered in favor of the defendant and against the Corporation or a recipient's plaintiff, the court may, upon motion by the defendant and upon a finding by the court that the action was commenced or pursued for the sole purpose of harassment of the defendant or that the Corporation or a recipient's plaintiff maliciously abused legal process, enter an order (which shall be appealable before being made final) awarding reasonable costs and legal fees incurred by the defendant in defense of the action, except when in contravention of a State law, a rule of court, or a statute of general applicability. Any such costs and fees shall be directly paid by the Corporation."

On the other hand, remarks made during the debates on this legislation indicate that there was no intent to restrict the plaintiff's

It is true that under some, if not most, of the statutes providing for the allowance of reasonable fees, Congress has opted to rely heavily on private enforcement to implement public policy and to allow counsel fees so as to encourage private litigation. Fee shifting in connection with treble-damages awards under the antitrust laws is a prime example; cf. *Hawaii* v. *Standard Oil Co.,* 405 U. S. 251, 265-266 (1972); and we have noted that Title II of the Civil Rights Act of 1964 was intended "not simply to penalize litigants who deliberately advance arguments they know to be untenable but, more broadly, to encourage individuals injured by racial discrimination to seek judicial relief under Title II." *Newman, supra,* at 402 (footnote omitted). But congressional utilization of the private-attorney-general concept can in no sense be construed as a grant of authority to the Judiciary to jettison the traditional rule against nonstatutory allowances to the prevailing party and to award attorneys' fees whenever the courts deem the public policy furthered by a particular statute important enough to warrant the award.

Congress itself presumably has the power and judgment to pick and choose among its statutes and to allow attorneys' fees under some, but not others. But it would be difficult, indeed, for the courts, without legislative

---

recovery of attorneys' fees in actions commenced by the Corporation or its recipient where under the circumstances other plaintiffs would be awarded such fees. 120 Cong. Rec. 15001 (1974) (Rep. Meeds); *id.,* at 15008 (Rep. Steiger); *id.,* at 24037 (Sen. Cranston); *id.,* at 24052 (Sen. Mondale); *id.,* at 24056 (Sen. Kennedy). Thus, if other plaintiffs might recover on the private-attorney-general theory, so might the Corporation. Congress itself, of course, has provided for counsel fees under various statutes on a private-attorney-general basis; and we find nothing in these remarks indicating any congressional approval of judicially created private-attorney-general fee awards.

guidance, to consider some statutes important and others unimportant and to allow attorneys' fees only in connection with the former. If the statutory limitation of right-of-way widths involved in this case is a matter of the gravest importance, it would appear that a wide range of statutes would arguably satisfy the criterion of public importance and justify an award of attorneys' fees to the private litigant. And, if *any* statutory policy is deemed so important that its enforcement must be encouraged by awards of attorneys' fees, how could a court deny attorneys' fees to private litigants in actions under 42 U. S. C. § 1983 seeking to vindicate *constitutional* rights? Moreover, should courts, if they were to embark on the course urged by respondents, opt for awards to the prevailing party, whether plaintiff or defendant, or only to the prevailing plaintiff? [37] Should awards be discretionary or mandatory? [38] Would there be a presumption operating for or against them in the ordinary case? See *Newman, supra.* [39]

---

[37] Congress in its specific statutory authorizations of fee shifting has in some instances provided that either party could be given such an award depending upon the outcome of the litigation and the court's discretion, see, *e. g.,* 35 U. S. C. § 285 (patent infringement); Civil Rights Act of 1964, 42 U. S. C. §§ 2000a–3 (b), 2000e–5 (k), while in others it has specified that only one of the litigants can be awarded fees. See, *e. g.,* the antitrust laws, 15 U. S. C. § 15; Fair Labor Standards Act, 29 U. S. C. § 216 (b).

[38] Congress has specifically provided in the statutes allowing awards of fees whether such awards are mandatory under particular conditions or whether the court's discretion governs. See nn. 34 and 35, *supra.*

[39] Mr. Justice Marshall, *post,* at 284–285, after concluding that the federal courts have equitable power which can be used to create and implement a private-attorney-general rule, attempts to solve the problems of manageability which such a rule would necessarily raise. To do so, however, he emasculates the theory. Instead of a straightforward award of attorneys' fees to the winning plaintiff

As exemplified by this case itself, it is also evident that the rational application of the private-attorney-general rule would immediately collide with the express provision

who undertakes to enforce statutes embodying important public policies, as the Court of Appeals proposed, MR. JUSTICE MARSHALL would tax attorneys' fees in favor of the private attorney general only when the award could be said to impose the burden on those who benefit from the enforcement of the law. The theory that he would adopt is not the private-attorney-general rule, but rather an expanded version of the common-fund approach to the awarding of attorneys' fees. When Congress has provided for allowance of attorneys' fees for the private attorney general, it has imposed no such common-fund conditions upon the award. ~The dissenting opinion not only errs in finding authority in the courts to award attorneys' fees, without legislative guidance, to those plaintiffs the courts are willing to recognize as private attorneys general, but also disserves that basis for fee shifting by imposing a limiting condition characteristic of other justifications.

That condition ill suits litigation in which the purported benefits accrue to the general public. In this Court's common-fund and common-benefit decisions, the classes of beneficiaries were small in number and easily identifiable. The benefits could be traced with some accuracy, and there was reason for confidence that the costs could indeed be shifted with some exactitude to those benefiting. In this case, however, sophisticated economic analysis would be required to gauge the extent to which the general public, the supposed beneficiary, as distinguished from selected elements of it, would bear the costs. The Court of Appeals, very familiar with the litigation and the parties after dealing with the merits of the suit, concluded that "imposing attorneys' fees on Alyeska will not operate to spread the costs of litigation proportionately among these beneficiaries . . . ." 161 U. S. App. D. C., at 449, 495 F. 2d, at 1029. MR. JUSTICE MARSHALL would apparently hold that factual assessment clearly wrong. See *post,* at 288.

If one accepts, as MR. JUSTICE MARSHALL appears to do, the limitations of 28 U. S. C. § 2412, which in the absence of authority under other statutes forbids an award of attorneys' fees against the United States or any agency or official of the United States, see nn. 40 and 42, *infra,* it becomes extremely difficult to predict when his version of the private-attorney-general basis for allowing fees

of 28 U. S. C. § 2412.[40]   Except as otherwise provided by statute, that section permits costs to be taxed against the United States, "but not including the fees and expenses

would produce an award against a private party in litigation involving the enforcement of a federal statute such as that involved in this case—all in contrast to the typical result under those federal statutes which themselves provide for private actions and for an award of attorneys' fees to the successful private plaintiff as, for example, under the antitrust laws.   There remains the private plaintiff whose suit to enforce federal or state law is pressed against defendants who include the State or one or more of its agencies or officers as, for instance, the typical suit under 42 U. S. C. § 1983. Even here Eleventh Amendment hurdles must be overcome, see n. 44, *infra,* and if they are not, there may be few remaining defendants who would satisfy the dissenting opinion's description of the litigant who may be saddled with his opponent's attorneys' fees.

We add that in the three-part test suggested by MR. JUSTICE MARSHALL, *post,* at 284–285, for administering a judicially created private-attorney-general rule, the only criterion which purports to enable a court to determine which statutes should be enforced by application of the rule is the first: "the important right being protected is one actually or necessarily shared by the general public or some class thereof . . . ."   Absent some judicially manageable standard for gauging "importance," that criterion would apply to all substantive congressional legislation providing for rights and duties generally applicable, that is, to virtually all congressional output. That result would solve the problem of courts selectively applying the rule in accordance with their own particular substantive-law preferences and priorities, but its breadth requires more justification than MR. JUSTICE MARSHALL provides by citing this Court's common-fund and common-benefit cases.

MR. JUSTICE MARSHALL's application of his suggested rule to this case, however, demonstrates the problems raised by courts generally assaying the public benefits which particular litigation has produced.   The conclusion of the dissenting opinion is that "[t]here is hardly room for doubt" that respondents' litigation has protected an "important right . . . actually or necessarily shared by the general public or some class thereof . . . ."   *Post,* at 285.   Whether that conclusion is correct or not, it would appear at the very least

of attorneys," in any civil action brought by or against the United States or any agency or official of the United States acting in an official capacity. If, as respondents argue, one of the main functions of a private attorney general is to call public officials to account and to insist that they enforce the law, it would follow in such cases that attorneys' fees should be awarded against the Government or the officials themselves. Indeed, that very claim was asserted in this case.[41] But § 2412 on its face, and in light of its legislative history, generally bars such awards,[42] which, if allowable at all, must be expressly

that, as in any instance of conflicting public-policy views, there is room for doubt on each side. The opinions below are evidence of that fact. See 161 U. S. App. D. C., at 452–456, 495 F. 2d, at 1032–1036 (majority opinion); *id.*, at 459–461, 495 F. 2d, at 1039–1041 (MacKinnon, J., dissenting); *id.*, at 462–464, 495 F. 2d, at 1042–1044 (Wilkey, J., dissenting). It is that unavoidable doubt which calls for specific authority from Congress before courts apply a private-attorney-general rule in awarding attorneys' fees.

[40] "Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title but not including the fees and expenses of attorneys may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or official of the United States acting in his official capacity, in any court having jurisdiction of such action. A judgment for costs when taxed against the Government shall, in an amount established by statute or court rule or order, be limited to reimbursing in whole or in part the prevailing party for the costs incurred by him in the litigation. Payment of a judgment for costs shall be as provided in section 2414 and section 2517 of this title for the payment of judgments against the United States."

[41] See *supra*, at 246.

[42] The Act of Mar. 3, 1887, which provided for the bringing of suits against the United States, covered the awarding of costs against the Government in the following section:

"If the Government of the United States shall put in issue the right of the plaintiff to recover the court may, in its discretion, allow costs to the prevailing party from the time of joining such issue. Such costs, however, shall include only what is actually incurred

provided for by statute, as, for example, under Title II of the Civil Rights Act of 1964, 42 U. S. C. § 2000a–3 (b).[43]

for witnesses, and for summoning the same, and fees paid to the clerk of the court." § 15, 24 Stat. 508.

The same section was included in the Judicial Code of 1911. § 252, 36 Stat. 1138. In 1946, the Federal Tort Claims Act provided: "Costs shall be allowed in all courts to the succesful claimant to the same extent as if the United States were a private litigant, except that such costs shall not include attorneys' fees." § 410 (a), 60 Stat. 844. The 1948 Code provided in 28 U. S. C. § 2412 (a) (1946 ed., Supp. II) that "[t]he United States shall be liable for fees and costs only when such liability is expressly provided for by Act of Congress." The Reviser observed: "[Section 2412 (a)] is new. It follows the well-known common-law rule that a sovereign is not liable for costs unless specific provision for such liability is made by law." Noting that many statutes exempt the United States from liability for fees and costs, the Reviser concluded that "[a] uniform rule, embodied in this section, will make such specific exceptions unnecessary." In 1966, § 2412 was amended to its present form. 80 Stat. 308. The Senate Report on the proposed bill stated that "[t]he costs referred to in the section do not include fees and expenses of attorneys." S. Rep. No. 1329, 89th Cong., 2d Sess., 3 (1966). See also H. R. Rep. No. 1535, 89th Cong., 2d Sess., 2, 3 (1966). The Attorney General, in transmitting the proposal for legislation which led to the amendment, said that "[t]he bill makes it clear that the fees and expenses of attorneys . . . may not be taxed against the United States." *Id.,* at 4. See *Pyramid Lake Paiute Tribe of Indians* v. *Morton,* 163 U. S. App. D. C. 90, 499 F. 2d 1095 (1974), cert. denied, 420 U. S. 962 (1975).

Without departing from this pattern, the Federal Tort Claims Act of 1946 in addition limited the fees which courts could allow and which attorneys could charge their clients and provided that the fees were "to be paid out of but not in addition to the amount of judgment, award, or settlement recovered, to the attorneys representing the claimant." § 422, 60 Stat. 846. See also § 410 (a). Section 422 was maintained in the 1948 Code as 28 U. S. C. § 2678 (1946 ed., Supp. II), and the percentage limitations were raised in 1966. 80 Stat. 307.

[43] See n. 35, *supra.* See also Amendments to Freedom of Infor-

We need labor the matter no further. It appears to us that the rule suggested here and adopted by the Court of Appeals would make major inroads on a policy matter that Congress has reserved for itself. Since the approach taken by Congress to this issue has been to carve out specific exceptions to a general rule that federal courts cannot award attorneys' fees beyond the limits of 28 U. S. C. § 1923, those courts are not free to fashion drastic new rules with respect to the allowance of attorneys' fees to the prevailing party in federal litigation or to pick and choose among plaintiffs and the statutes under which they sue and to award fees in some cases but not in others, depending upon the courts' assessment of the importance of the public policies involved in particular cases. Nor should the federal courts purport to adopt on their own initiative a rule awarding attorneys' fees based on the private-attorney-general approach when such judicial rule will operate only against private parties and not against the Government.[44]

---

mation Act, Pub. L. 93–502, § 1 (b) (2), 88 Stat. 1561 (amending 5 U. S. C. § 552 (a)).

[44] Although an award against the United States is foreclosed by 28 U. S. C. § 2412 in the absence of other statutory authorization, an award against a state government would raise a question with respect to its permissibility under the Eleventh Amendment, a question on which the lower courts are divided. Compare *Souza* v. *Travisono,* 512 F. 2d 1137 (CA1 1975); *Class* v. *Norton,* 505 F. 2d 123 (CA2 1974); *Jordan* v. *Fusari,* 496 F. 2d 646 (CA2 1974); *Gates* v. *Collier,* 489 F. 2d 298 (CA5 1973), petition for rehearing en banc granted, 500 F. 2d 1382 (CA5 1974); *Brandenburger* v. *Thompson,* 494 F. 2d 885 (CA9 1974); *Sims* v. *Amos,* 340 F. Supp. 691 (MD Ala.), summarily aff'd, 409 U. S. 942 (1972), with *Jordan* v. *Gilligan,* 500 F. 2d 701 (CA6 1974); *Taylor* v. *Perini,* 503 F. 2d 899 (CA6 1974); *Named Individual Members* v. *Texas Highway Dept.,* 496 F. 2d 1017 (CA5 1974); *Skehan* v. *Board of Trustees of Bloomsburg State College,* 501 F. 2d 31 (CA3 1974). In this case, the Court of Appeals did not rely upon the Eleventh Amendment in declining to award

We do not purport to assess the merits or demerits of the "American Rule" with respect to the allowance of attorneys' fees. It has been criticized in recent years,[45] and courts have been urged to find exceptions to it.[46]

fees against Alaska, see n. 16, *supra,* and therefore we have no occasion to address this question.

[45] See, *e. g.,* McLaughlin, The Recovery of Attorney's Fees: A New Method of Financing Legal Services, 40 Ford. L. Rev. 761 (1972); Ehrenzweig, Reimbursement of Counsel Fees and the Great Society, 54 Calif. L. Rev. 792 (1966); Stoebuck, Counsel Fees Included in Costs: A Logical Development, 38 U. Colo. L. Rev. 202 (1966); Kuenzel, The Attorney's Fee: Why Not a Cost of Litigation?, 49 Iowa L. Rev. 75 (1963); McCormick, Counsel Fees and Other Expenses of Litigation as an Element of Damages, 15 Minn. L. Rev. 619 (1931); Comment, Court Awarded Attorney's Fees and Equal Access to the Court, 122 U. Pa. L. Rev. 636, 648–655 (1974); Note, Attorney's Fees: Where Shall the Ultimate Burden Lie?, 20 Vand. L. Rev. 1216 (1967). See also 1 Speiser § 12.8; Posner, An Economic Approach to Legal Procedure and Judicial Administration, 2 J. Legal Studies 399, 437–438 (1973).

[46] In recent years, some lower federal courts, erroneously, we think, have employed the private-attorney-general approach to award attorneys' fees. See, *e. g., Souza* v. *Travisono, supra; Hoitt* v. *Vitek,* 495 F. 2d 219 (CA1 1974); *Knight* v. *Auciello,* 453 F. 2d 852 (CA1 1972); *Cornist* v. *Richland Parish School Board,* 495 F. 2d 189 (CA5 1974); *Fairley* v. *Patterson,* 493 F. 2d 598 (CA5 1974); *Cooper* v. *Allen,* 467 F. 2d 836 (CA5 1972); *Lee* v. *Southern Home Sites Corp.,* 444 F. 2d 143 (CA5 1971); *Taylor* v. *Perini, supra; Morales* v. *Haines,* 486 F. 2d 880 (CA7 1973); *Donahue* v. *Staunton,* 471 F. 2d 475 (CA7 1972), cert. denied, 410 U. S. 955 (1973); *Fowler* v. *Schwarzwalder,* 498 F. 2d 143 (CA8 1974); *Brandenburger* v. *Thompson, supra; La Raza Unida* v. *Volpe,* 57 F. R. D. 94 (ND Cal. 1972). The Court of Appeals for the Fourth Circuit has refused to adopt the private-attorney-general rule. *Bradley* v. *School Board of the City of Richmond,* 472 F. 2d 318, 327–331 (1972), vacated on other grounds, 416 U. S. 696 (1974). Cf. *Bridgeport Guardians, Inc.* v. *Members of Bridgeport Civil Service Comm'n,* 497 F. 2d 1113 (CA2 1974).

This Court's summary affirmance of the decision in *Sims* v. *Amos, supra,* cannot be taken as an acceptance of a judicially created

It is also apparent from our national experience that the encouragement of private action to implement public policy has been viewed as desirable in a variety of circumstances. But the rule followed in our courts with respect to attorneys' fees has survived. It is deeply rooted in our history and in congressional policy; and it is not for us to invade the legislature's province by redistributing litigation costs in the manner suggested by respondents and followed by the Court of Appeals.[47]

The decision below must therefore be reversed.

*So ordered.*

MR. JUSTICE DOUGLAS and MR. JUSTICE POWELL took no part in the consideration or decision of this case.

MR. JUSTICE BRENNAN, dissenting.

I agree with MR. JUSTICE MARSHALL that federal equity courts have the power to award attorneys' fees

---

private-attorney-general rule. The District Court in *Sims* indicated that there was an alternative ground available—the bad faith of the defendants—upon which to base the award of fees. 340 F. Supp., at 694. See also *Edelman* v. *Jordan*, 415 U. S. 651, 670–671 (1974).

[47] The Senate Subcommittee on Representation of Citizen Interests has recently conducted hearings on the general question of court awards of attorneys' fees to prevailing parties in litigation and attempted "to ascertain whether 'fee-shifting' affords representation to otherwise unrepresented interests, whether some restriction or encouragement of the development is needed, and what place, if any, there is for legislation in this area." Hearings on Legal Fees before the Subcommittee on Representation of Citizen Interests of the Senate Committee on the Judiciary, 93d Cong., 1st Sess., pt. III, p. 788 (1973) (Sen. Tunney). As MR. JUSTICE MARSHALL said for the Court in *F. D. Rich Co., Inc.* v. *United States ex rel. Industrial Lumber Co.*, 417 U. S. 116 (1974), with respect to fee shifting under the Miller Act, 49 Stat. 793, as amended, 40 U. S. C. § 270a *et seq.*, "Congress is aware of the issue." 417 U. S., at 131 (footnote omitted). As in that case, "arguments for a further departure from the American Rule . . . are properly addressed to Congress." *Ibid.*

on a private-attorney-general rationale. Moreover, for the reasons stated by Judge Wright in the Court of Appeals, I would hold that this case was a proper one for the exercise of that power. As Judge Wright concluded:

"Acting as private attorneys general, not only have [respondents] ensured the proper functioning of our system of government, but they have advanced and protected in a very concrete manner substantial public interests. An award of fees would not have unjustly discouraged [petitioner] Alyeska from defending its case in court. And denying fees might well have deterred [respondents] from undertaking the heavy burden of this litigation." 161 U. S. App. D. C. 446, 456, 495 F. 2d 1026, 1036.

MR. JUSTICE MARSHALL, dissenting.

In reversing the award of attorneys' fees to the respondent environmentalist groups, the Court today disavows the well-established power of federal equity courts to award attorneys' fees when the interests of justice so require. While under the traditional American Rule the courts ordinarily refrain from allowing attorneys' fees, we have recognized several judicial exceptions to that rule for classes of cases in which equity seemed to favor fee shifting. See *Sprague* v. *Ticonic National Bank*, 307 U. S. 161 (1939); *Mills* v. *Electric Auto-Lite Co.*, 396 U. S. 375, 391–392 (1970); *Hall* v. *Cole*, 412 U. S. 1, 5, 9 (1973). By imposing an absolute bar on the use of the "private attorney general" rationale as a basis for awarding attorneys' fees, the Court today takes an extremely narrow view of the independent power of the courts in this area—a view that flies squarely in the face of our prior cases.

The Court relies primarily on the docketing-fees-and-

court-costs statute, 28 U. S. C. § 1923, in concluding that
the American Rule is grounded in statute and that the
courts may not award counsel fees unless they determine
that Congress so intended. The various exceptions to
the rule against fee shifting that this Court has created
in the past are explained as constructions of the fee
statute. *Ante,* at 257. In addition, the Court notes that
Congress has provided for attorneys' fees in a number of
statutes, but made no such provision in others. It con-
cludes from this selective treatment that where award of
attorneys' fees is not expressly authorized, the courts
should deny them as a matter of course. Finally, the
Court suggests that the policy questions bearing on
whether to grant attorneys' fees in a particular case are
not ones that the Judiciary is well equipped to handle,
and that fee shifting under the private-attorney-general
rationale would quickly degenerate into an arbitrary and
lawless process. Because the Court concludes that grant-
ing attorneys' fees to private attorneys general is beyond
the equitable power of the federal courts, it does not
reach the question whether an award would be proper
against Alyeska in this case under the private-attorney-
general rationale.

On my view of the case, both questions must be an-
swered. I see no basis in precedent or policy for holding
that the courts cannot award attorneys' fees where the
interests of justice require recovery, simply because the
claim does not fit comfortably within one of the previ-
ously sanctioned judicial exceptions to the American
Rule. The Court has not in the past regarded the
award of attorneys' fees as a matter reserved for the
Legislature, and it has certainly not read the docketing-
fees statute as a general bar to judicial fee shifting.
The Court's concern with the difficulty of applying
meaningful standards in awarding attorneys' fees to suc-

cessful "public benefit" litigants is a legitimate one, but in my view it overstates the novelty of the "private attorney general" theory. The guidelines developed in closely analogous statutory and nonstatutory attorneys' fee cases could readily be applied in cases such as the one at bar. I therefore disagree with the Court's flat rejection of the private-attorney-general rationale for fee shifting. Moreover, in my view the equities in this case support an award of attorneys' fees against Alyeska. Accordingly, I must respectfully dissent.

## I

### A

Contrary to the suggestion in the Court's opinion, our cases unequivocally establish that granting or withholding attorneys' fees is not strictly a matter of statutory construction, but has an independent basis in the equitable powers of the courts. In *Sprague* v. *Ticonic National Bank, supra,* the lower courts had denied a request for attorneys' fees from the proceeds of certain bond sales, which, because of petitioners' success in the litigation, would accrue to the benefit of a number of other similarly situated persons. This Court reversed, holding that the allowance of attorneys' fees and costs beyond those included in the ordinary taxable costs recognized by statute was within the traditional equity jurisdiction of the federal courts. The Court regarded the equitable foundation of the power to allow fees to be beyond serious question:

> "Allowance of such costs in appropriate situations is part of the historic equity jurisdiction of the federal courts." 307 U. S., at 164. "Plainly the foundation for the historic practice of granting reimbursement for the costs of litigation other than the conventional [statutory] taxable costs is part of

the original authority of the chancellor to do equity in a particular situation." *Id.*, at 166.[1]

In more recent cases, we have reiterated the same theme: while as a general rule attorneys' fees are not to be awarded to the successful litigant, the courts as well as the Legislature may create exceptions to that rule. See *Mills* v. *Electric Auto-Lite Co.*, 396 U. S., at 391–392; *Hall* v. *Cole*, 412 U. S., at 5. Under the judge-made exceptions, attorneys' fees have been assessed, without statutory authorization, for willful violation of a court order, *Toledo Scale Co.* v. *Computing Scale Co.*, 261 U. S. 399, 426–428 (1923); for bad faith or oppressive litigation practices, *Vaughan* v. *Atkinson*, 369 U. S. 527, 530–531 (1962); and where the successful litigants have created a common fund for recovery or extended a substantial benefit to a class, *Central Railroad & Banking Co.* v. *Pettus*, 113 U. S. 116 (1885); *Mills* v. *Electric Auto-Lite Co.*, *supra.*[2] While the Court today acknowledges the continued vitality of these exceptions, it turns its back on the theory underlying them, and on the generous construction given to the common-benefit exception in our recent cases.

In *Mills*, we found the absence of statutory authorization no barrier to extending the common-benefit theory to include nonmonetary benefits as a basis for awarding

---

[1] See also *Kansas City Southern R. Co.* v. *Guardian Trust Co.*, 281 U. S. 1, 9 (1930); *Universal Oil Products Co.* v. *Root Refining Co.*, 328 U. S. 575, 580 (1946).

[2] On several recent occasions we have recognized that these exceptions are well established in our equity jurisprudence. See *F. D. Rich Co., Inc.* v. *United States ex rel. Industrial Lumber Co.*, 417 U. S. 116, 129–130 (1974); *Hall* v. *Cole*, 412 U. S. 1, 5 (1973); *Fleischmann Distilling Corp.* v. *Maier Brewing Co.*, 386 U. S. 714, 718–719 (1967). See also *Newman* v. *Piggie Park Enterprises, Inc.*, 390 U. S. 400, 402 n. 4 (1968); 6 J. Moore, Federal Practice ¶ 54.77 [2], p. 1709 (2d ed. 1974).

fees in a stockholders' derivative suit. Discovering nothing in the applicable provisions of the Securities Exchange Act of 1934 to indicate that Congress intended "to circumscribe the courts' power to grant appropriate remedies," 396 U. S., at 391, we concluded that the District Court was free to determine whether special circumstances would justify an award of attorneys' fees and litigation costs in excess of the statutory allotment. Because the petitioners' lawsuit presumably accrued to the benefit of the corporation and the other shareholders, and because permitting the others to benefit from the petitioners' efforts without contributing to the costs of the litigation would result in a form of unjust enrichment, the Court held that the petitioners should be given an attorneys' fee award assessed against the respondent corporation.

We acknowledged in *Mills* that the common-fund exception to the American Rule had undergone considerable expansion since its earliest applications in cases in which the court simply ordered contribution to the litigation costs from a common fund produced for the benefit of a number of nonparty beneficiaries. The doctrine could apply, the Court wrote, where there was no fund at all, *id.*, at 392, but simply a benefit of some sort conferred on the class from which contribution is sought. *Id.*, at 393–394. As long as the court has jurisdiction over an entity through which the contribution can be effected, it is the fairer course to relieve the plaintiff of exclusive responsibility for the burden. Finally, we noted that even where it is impossible to assign monetary value to the benefit conferred, "the stress placed by Congress on the importance of fair and informed corporate suffrage leads to the conclusion that, in vindicating the statutory policy, petitioners have rendered a substantial service to the corporation and its

shareholders." *Id.*, at 396. The benefit that we discerned in *Mills* went beyond simple monetary relief: it included the benefit to the shareholders of having available to them "an important means of enforcement of the proxy statute." *Ibid.*

Only two years ago, in a member's suit against his union under the "free speech" provisions of the Labor-Management Reporting and Disclosure Act, we held that it was within the equitable power of the federal courts to grant attorneys' fees against the union, since the plaintiff had conferred a substantial benefit on all the members of the union by vindicating their free speech interests. *Hall* v. *Cole*, 412 U S. 1 (1973). Because a court-ordered award of attorneys' fees in a suit under the free speech provision of the LMRDA promoted Congress' intention to afford meaningful protection for the rights of employees and the public generally, and because without provision of attorneys' fees an aggrieved union member would be unlikely to be able to finance the necessary litigation, *id.*, at 13, the Court held that the allowance of counsel fees was "consistent with both the [LMRDA] and the historic equitable power of federal courts to grant such relief in the interests of justice." *Id.*, at 14.

In my view, these cases simply cannot be squared with the majority's suggestion that the availability of attorneys' fees is entirely a matter of statutory authority. The cases plainly establish an independent basis for equity courts to grant attorneys' fees under several rather generous rubrics. The Court acknowledges as much when it says that we have independent authority to award fees in cases of bad faith or as a means of taxing costs to special beneficiaries. But I am at a loss to understand how it can also say that this independent judicial power succumbs to Procrustean statutory restrictions—indeed, to statutory silence—as soon as the far

from bright line between common benefit and public benefit is crossed. I can only conclude that the Court is willing to tolerate the "equitable" exceptions to its analysis, not because they can be squared with it, but because they are by now too well established to be casually dispensed with.

B

The tension between today's opinion and the less rigid treatment of attorneys' fees in the past is reflected particularly in the Court's analysis of the docketing-fees statute, 28 U. S. C. § 1923, as a general statutory embodiment of the American Rule. While the Court has held in the past that Congress can restrict the availability of attorneys' fees under a particular statute either expressly or by implication,[3] see *Fleischmann Distilling Corp.* v. *Maier Brewing Co.*, 386 U. S. 714 (1967), it has refused to construe § 1923 as a plenary restraint on attorneys' fee awards.

Starting with the early common-fund cases, the Court has consistently read the fee-bill statute of 1853 narrowly when that Act has been interposed as a restriction on the Court's equitable powers to award attorneys' fees. In *Trustees* v. *Greenough,* 105 U. S. 527 (1881), the Court held that the statute imposed no bar to an award of attorneys' fees from the fund collected as a result of the plaintiff's efforts, since:

"[The fee bill statute addressed] only those fees

---

[3] In *F. D. Rich Co., Inc.* v. *United States ex rel. Industrial Lumber Co.,* 417 U. S. 116 (1974), we held that attorneys' fees should not be granted as a matter of course under the provision of the Miller Act that granted claimants the right to "sums justly due." 49 Stat. 794, as amended, 40 U. S. C. § 270b (a). To overturn the American Rule as a matter of statutory construction would be improper, we held, with no better evidence of congressional intent to provide for attorneys' fees, and in the context of everyday commercial litigation such as that under the Miller Act. 417 U. S., at 130.

and costs which are strictly chargeable as between party and party, and [did not] regulate the fees of counsel and other expenses and charges as between solicitor and client . . . . And the act contains nothing which can be fairly construed to deprive the Court of Chancery of its long-established control over the costs and charges of the litigation, to be exercised as equity and justice may require . . . ." *Id.*, at 535–536.

In *Sprague, supra,* the Court again applied this distinction in recognizing "the power of federal courts in equity suits to allow counsel fees and other expenses entailed by the litigation not included in the ordinary taxable costs recognized by statute." 307 U. S., at 164. The Court there identified the costs "between party and party" as the sole target of the 1853 Act and its successors. The award of attorneys' fees beyond the limited ordinary taxable costs, the Court termed costs "as between solicitor and client"; it held that these expenses, which could be assessed to the extent that fairness to the other party would permit, were not subject to the restrictions of the fee statute. *Id.*, at 166, and n. 2. Whether this award was collected out of a fund in the court or through an assessment against the losing party in the litigation was not deemed controlling. *Id.*, at 166–167; *Mills,* 396 U. S., at 392–394.

More recently, the Court gave its formal sanction to the line of lower court cases holding that the fee statute imposed no restriction on the equity court's power to include attorneys' fees in the plaintiff's award when the defendant has unjustifiably put the plaintiff to the expense of litigation in order to obtain a benefit to which the latter was plainly entitled. *Vaughan* v. *Atkinson,* 369 U. S. 527 (1962). Distinguishing *The Baltimore,* 8 Wall. 377 (1869), a case upon which the Court

today heavily relies, the Court in *Vaughan* noted that the question was not one of "costs" in the statutory sense, since the attorneys' fee award was legitimately included as a part of the primary relief to which the plaintiff was entitled, rather than an ancillary adjustment of litigation expenses.[4]

Finally, in *Fleischmann Distilling Corp.* v. *Maier Brewing Co.*, 386 U. S. 714 (1967), the Court undertook a comprehensive review of the assessment of attorneys' fees in federal-court actions. While noting that nonstatutory exceptions to the American Rule had been sanctioned "when overriding considerations of justice seemed to compel such a result," *id.*, at 718, the Court held that the meticulous provision of remedies available under the Lanham Act and the history of unsuccessful attempts to include an attorneys' fee provision in the Act precluded the Court's implying a right to attorneys' fees in trademark actions. The Court did not, however, purport to find a statutory basis for the American Rule, and in fact it treated § 1923 as a "general exception" to the American Rule, not its statutory embodiment. 386 U. S., at 718 n. 11.

My Brother WHITE concedes that the language of the 1853 statute indicating that the awards provided therein were exclusive of any other compensation is no longer a part of the fee statute. But we are told that the fee statute should be read as if that language were still in the Act,

---

[4] Although *Vaughan* was an admiralty case and therefore subject to the possibly narrow reading as a case evincing a special concern for plaintiff seamen as wards of the admiralty court, we have not given the case such a narrow construction. See *Hall* v. *Cole*, 412 U. S., at 5; *F. D. Rich Co., Inc.* v. *United States ex rel. Industrial Lumber Co.*, 417 U. S., at 129 n. 17. Indeed, the *Vaughan* Court itself relied on *Rolax* v. *Atlantic Coast Line R. Co.*, 186 F. 2d 473 (CA4 1951), a nonadmiralty case in which the plaintiff was awarded attorneys' fees as an equitable matter because of the obduracy of the defendant in opposing the plaintiff's civil rights claim.

since there is no indication in the legislative history of the 1948 revision of the Judicial Code that the revisers intended to alter the meaning of § 1923. Yet even if that language were still in the Act, I should think that the construction of the Act in the cases creating judicial exceptions to the American Rule would suffice to dispose of the Court's argument. Since that language is no longer a part of the fee statute, it seems even less reasonable to read the fee statute as an uncompromising bar to equitable fee awards.

Nor can any support fairly be drawn from Congress' failure to provide expressly for attorneys' fees in either the National Environmental Policy Act or the Mineral Leasing Act, while it has provided for fee awards under other statutes. Confronted with the more forceful argument that other sections of the *same* statute included express provisions for recovery of attorneys' fees, we twice held that specific-remedy provisions in some sections should not be interpreted as evidencing congressional intent to deny the courts the power to award counsel fees in actions brought under other sections of that Act that do not mention attorneys' fees. *Hall* v. *Cole,* 412 U. S., at 11; *Mills* v. *Electric Auto-Lite Co.,* 396 U. S., at 390–391. Indeed, the *Mills* Court interpreted congressional silence, not as a prohibition, but as authorization for the Court to decide the attorneys'-fees issue in the exercise of its coordinate, equitable power. *Id.,* at 391. In rejecting the argument from congressional silence in *Mills* and *Hall,* the Court relied on the established rule that implied restrictions on the power to do equity are disfavored. *Hecht Co.* v. *Bowles,* 321 U. S. 321, 329 (1944).[5] The same principle

---

[5] The words of the *Hecht* Court apply well to the case at hand: "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities

applies, *a fortiori*, to this case, where the implication must be drawn from the presence of attorneys' fees provisions in other, unrelated pieces of legislation.[6]

In sum, the Court's primary contention—that Congress enjoys hegemony over fee shifting because of the docketing-fee statute and the occasional express provisions for attorneys' fees—will not withstand even the most casual reading of the precedents. The Court's recognition of the several judge-made exceptions to the American rule demonstrates the inadequacy of its analysis. Whatever the Court's view of the wisdom of fee shifting in "public benefit" cases in general, I think that it is a serious misstep for it to abdicate equitable authority in this area in the name of statutory construction.

II

The statutory analysis aside, the Court points to the difficulties in formulating a "private attorney general" exception that will not swallow the American Rule. I do not find the problem as vexing as the majority does. In fact, the guidelines to the proper application of the

---

of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. We do not believe that such a major departure from that long tradition as is here proposed should be lightly implied." 321 U. S., at 329–330.

[6] The Court makes the further point that 28 U. S. C. § 2412 generally precludes a grant of attorneys' fees against the Federal Government and its officers. Even if this is true, I fail to see how it supports the view that the private-attorney-general rationale should be jettisoned altogether. There are many situations in which other entities, both private and public, are sued in public interest cases. If attorneys' fees can properly be imposed on those parties, I see no reason why the statutory immunity of the Federal Government should have any bearing on the matter.

private-attorney-general rationale have been suggested in several of our recent cases, both under statutory attorneys' fee provisions and under the common-benefit exception.

In *Newman* v. *Piggie Park Enterprises, Inc.*, 390 U. S. 400 (1968), we held that successful plaintiffs who sue under the discretionary-fee-award provision of Title II of the Civil Rights Act of 1964 are entitled to the recovery of fees "unless special circumstances would render such an award unjust." 390 U. S., at 402. The Court reasoned that if Congress had intended to authorize fees only on the basis of bad faith, no new legislation would have been required in view of the long history of the bad-faith exception. *Id.*, at 402 n. 4. The Court's decision in *Newman* stands on the necessity of fee shifting to permit meaningful private enforcement of protected rights with a significant public impact. The Court noted that Title II did not provide for a monetary award, but only equitable relief. Absent a fee-shifting provision, litigants would be required to suffer financial loss in order to vindicate a policy "that Congress considered of the highest priority." 390 U. S., at 402. Accordingly, the Court read the attorneys'-fee provision in Title II generously, since if "successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts." 390 U. S., at 402.

Analyzing the attorneys'-fee provision in § 718 of the Education Amendments Act of 1972, the Court in *Bradley* v. *School Board of the City of Richmond*, 416 U. S. 696, 718 (1974), made a similar point. There the school board, a publicly funded governmental entity, had been engaged in litigation with parents of schoolchildren in the district. The Court observed that the

two parties had vastly disparate resources for litigation, and that the plaintiffs had "rendered substantial service both to the Board itself, by bringing it into compliance with its constitutional mandate, and to the community at large by securing for it the benefits assumed to flow from a nondiscriminatory educational system." *Id.,* at 718. Although the analysis in *Newman* was directed at construing the statutory-fees provision and the analysis in *Bradley* went to the question of whether the fees provision should be applied to services rendered before its enactment, the arguments in those cases for reading the attorneys' fee provisions broadly is quite applicable to nonstatutory cases as well.

Indeed, we have already recognized several of the same factors in the recent common-benefit cases. In *Mills,* we emphasized the benefit to the class of shareholders of having a meaningful remedy for corporate misconduct through private enforcement of the proxy regulations. Since the beneficiaries could fairly be taxed for this benefit, we held that the fee award should be made available. Similarly, in *Hall,* we pointed to the imbalance between the litigating power of the union and one of its members: in order to ensure that the right in question could be enforced, we held that attorneys' fees should be provided in appropriate cases. Additionally, we noted that the enforcement of the rights in question would accrue to the special benefit of the other union members, which justified assessing the attorneys' fees against the treasury of the defendant union.

From these cases and others, it is possible to discern with some confidence the factors that should guide an equity court in determining whether an award of attorneys' fees is appropriate.[7] The reasonable cost of the

---

[7] These teachings have not been lost on the lower courts in which the elements of the private-attorney-general rationale have been

plaintiff's representation should be placed upon the defendant if (1) the important right being protected is one actually or necessarily shared by the general public or some class thereof; (2) the plaintiff's pecuniary interest in the outcome, if any, would not normally justify incurring the cost of counsel; and (3) shifting that cost to the defendant would effectively place it on a class that benefits from the litigation.

There is hardly room for doubt that the first of these criteria is met in the present case. Significant public benefits are derived from citizen litigation to vindicate expressions of congressional or constitutional policy. See *Newman* v. *Piggie Park Enterprises, supra.* As a result of this litigation, respondents forced Congress to revise the Mineral Leasing Act of 1920 rather than permit its continued evasion. See Pub. L. 93–153, 87 Stat. 576. The 1973 amendments impose more stringent safety and liability standards, and they require Alyeska to pay fair market value for the right-of-way and to bear the costs of applying for the permit and monitoring the right-of-way.

Although the NEPA issues were not actually decided, the lawsuit served as a catalyst to ensure a thorough analysis of the pipeline's environmental impact. Requir-

---

more fully explored. See *e. g., Souza* v. *Travisono,* 512 F. 2d 1137 (CA1 1975); *Hoitt* v. *Vitek,* 495 F. 2d 219 (CA1 1974); *Knight* v. *Auciello,* 453 F. 2d 852 (CA1 1972); *Cornist* v. *Richland Parish School Board,* 495 F. 2d 189 (CA5 1974); *Fairley* v. *Patterson,* 493 F. 2d 598 (CA5 1974); *Cooper* v. *Allen,* 467 F. 2d 836 (CA5 1972); *Lee* v. *Southern Home Sites Corp.,* 444 F. 2d 143 (CA5 1971); *Taylor* v. *Perini,* 503 F. 2d 899 (CA6 1974); *Morales* v. *Haines,* 486 F. 2d 880 (CA7 1973); *Donahue* v. *Staunton,* 471 F. 2d 475 (CA7 1972), cert. denied, 410 U. S. 955 (1973); *Fowler* v. *Schwarzwalder,* 498 F. 2d 143 (CA8 1974); *Brandenburger* v. *Thompson,* 494 F. 2d 885 (CA9 1974); *La Raza Unida* v. *Volpe,* 57 F. R. D. 94 (ND Cal. 1972); *Wyatt* v. *Stickney,* 344 F. Supp. 387 (MD Ala. 1972); *NAACP* v. *Allen,* 340 F. Supp. 703 (MD Ala. 1972).

ing the Interior Department to comply with the NEPA and draft an impact statement satisfied the public's statutory right to have information about the environmental consequences of the project, 83 Stat. 853, 42 U. S. C. § 4332 (C), and also forced delay in the construction until safeguards could be included as conditions to the new right-of-way grants.[8]

Petitioner contends that these "beneficial results . . . might have occurred" without this litigation. Brief for Petitioner 11, 36–42. But the record demonstrates that Alyeska was unwilling to observe and the Government unwilling to enforce congressional land-use policy. Private action was necessary to assure compliance with the Mineral Leasing Act; the new environmental, technological, and land-use safeguards written into the 1973 amendments to the Act are directly traceable to the respondents' success in this litigation. In like manner, continued action was needed to prod the Interior Department into filing an impact statement; prior to the litigation, the Department and Alyeska were prepared to proceed with the construction of the pipeline on a piecemeal basis without considering the overall risks to the environment and to the physical integrity of the pipeline.

The second criterion is equally well satisfied in this case. Respondents' willingness to undertake this litigation was largely altruistic. While they did, of course, stand to benefit from the additional protections they sought for the area potentially affected by the pipeline, see *Sierra Club* v. *Morton,* 405 U. S. 727 (1972), the direct benefit to these citizen organizations is truly dwarfed by the demands of litigation of this proportion. Extensive factual discovery, expert scientific analysis, and legal

---

[8] See S. Rep. No. 93–207, p. 18 (1973); H. R. Rep. No. 93–414, p. 14 (1973); Hearings on S. 970, S. 993, and S. 1565 before the Senate Committee on Interior and Insular Affairs, 93d Cong., 1st Sess., pt. 4, pp. 56, 127 (1973).

research on a broad range of environmental, technological, and land-use issues were required. See Affidavit of Counsel (Re Bill of Costs), App. 213–219. The disparity between respondents' direct stake in the outcome and the resources required to pursue the case is exceeded only by the disparity between their resources and those of their opponents—the Federal Government and a consortium of giant oil companies.

Respondents' claim also fulfills the third criterion, for Alyeska is the proper party to bear and spread the cost of this litigation undertaken in the interest of the general public. The Department of the Interior, of course, bears legal responsibility for adopting a position later determined to be unlawful. And, since the class of beneficiaries from the outcome of this litigation is probably coextensive with the class of United States citizens, the Government should in fairness bear the costs of respondents' representation. But, the Court of Appeals concluded that it could not impose attorneys' fees on the United States, because in its view the statute providing for assessment of costs against the Government, 28 U. S. C. § 2412, permits the award of ordinary court costs, "but [does] not includ[e] the fees and expenses of attorneys." Since the respondents did not cross-petition on that point, we have no occasion to rule on the correctness of the court's construction of that statute.[9]

---

[9] The statute, construed in light of the rule against implied restrictions on equity jurisdiction, may not foreclose attorneys' fee awards against the United States in all cases. Section 2412 states that the ordinary recoverable costs shall not include attorneys' fees; it may be read not to bar fee awards, over and above ordinary taxable costs, when equity demands. In any event, there are plainly circumstances under which § 2412 would not bar attorneys' fee awards against the United States, see, *e. g., Natural Resources Defense Council, Inc.* v. *Environmental Protection Agency,* 484 F. 2d 1331 (CA1 1973).

Before the Department and the courts, Alyeska advocated adoption of the position taken by Interior, playing a major role in all aspects of the case.[10]   This litigation conferred direct and concrete economic benefits on Alyeska and its principals in affording protection of the physical integrity of the pipeline.   If a court could be reasonably confident that the ultimate incidence of costs imposed upon an applicant for a public permit would indeed be on the general public, it would be equitable to shift those costs to the applicant.[11]   In this connection, Alyeska, as a consortium of oil companies that do business in 49 States and account for some 20% of the national oil market, would indeed be able to redistribute the additional cost to the general public.   In my view the ability to pass the cost forward to the consuming public warrants an award here.   The decision to bypass Congress and avoid analysis of the environmental consequences of the pipeline was made in the first instance by Alyeska's principals and not the Secretary of the Interior.   The award does not punish the consortium for these actions but recognizes that it is an effective substitute for the public beneficiaries who successfully challenged these actions.   Since the Court of Appeals held Alyeska accountable for a fair share of the fees to ease the burden on the public-minded citizen litigators, I would affirm the judgment below.

---

[10] In requiring Alyeska to pay only half of the fee, the Court of Appeals correctly recognized that, absent the statutory bar, the Government would have been in an equal position to shift the costs to the public beneficiaries.

[11] See Dawson, Lawyers and Involuntary Clients in Public Interest Litigation, 88 Harv. L. Rev. 849, 902–905 (1975).