587 F.2d 1065
 B & J CRANE AND RIGGING, INC., a Texas Corporation, Plaintiff-Appellee,
v.
BEKER RESOURCES CORPORATION, a Delaware Corporation,
Defendant-Appellant,
and
Deltak Corporation, a Minnesota Corporation, Defendant-Appellee,
and
John Williams, Individually, Third Party Defendant-Appellee.
 No. 77-1004.
 United States Court of Appeals,
Tenth Circuit.
 Argued May 9, 1978.
Decided Dec. 1, 1978.
 
 W. T. Martin, Jr. of Matkins & Martin, Carlsbad, N. M., for defendant-appellant Beker Resources Corp.
 Henry G. Coors, IV, Albuquerque, N. M. (with W. John Brennan, Albuquerque, N. M., on the brief), of Coors, Singer & Broullire, Albuquerque, N. M., for plaintiff-appellee B & J Crane and Rigging, Inc.
 James L. Dow of Dow & Feezer, P. A., Carlsbad, N. M., for defendant-appellee Deltak Corp.
 Before BARRETT and McKAY, Circuit Judges, and BRATTON, District Judge.*
 McKAY, Circuit Judge.
 
 
 1
 This diversity action began when B & J Crane and Rigging, Inc. sought to foreclose a lien on property owned by Beker Resources Corporation. In addition, a dispute between Beker and Deltak Corporation was litigated when Deltak, another lien claimant, was joined as a defendant. Since the two lien disputes turn on different underlying obligations, the two controversies can be dealt with separately.
 
 THE B & J CASE
 
 2
 Beker desired to move a chemical facility from Illinois to New Mexico. To that end it entered into two written contracts with B & J. One was an $85,000 fixed sum contract for removing and shipping a large converter. The other was a cost plus five percent contract for the balance of the disassembly project. The first contract estimated the converter's weight at 250 tons. However, its true weight was 360 tons.[1] B & J discovered the weight discrepancy when its equipment, capable of handling 250 tons, could not do the job. Once the true facts relating to weight became known, Beker's construction supervisor authorized B & J to obtain alternate equipment and to accomplish the task under the cost plus five percent contract. B & J then disassembled its original rigging and completed the task with new rigging.
 
 
 3
 When B & J sent invoices totaling $85,000 under the fixed sum contract, both Beker's construction supervisor and controller at first refused to certify them because of concerns about duplicate payment. Shortly before he left Beker's employ, however, the supervisor instructed the controller to pay the $85,000. The controller declined to comply but instead sent the invoices to Beker's home office, which authorized payment. Beker paid the invoices and also paid the full amount due under the cost plus five contract.[2]
 
 
 4
 During the course of dismantling and shipping the plant, the parties entered into a third contract under which B & J agreed to install the converter in New Mexico for $55,000. Three days later, Beker, knowing that B & J was not licensed to contract in New Mexico, initiated modifications in the contract in order to avoid possible violations of New Mexico law.
 
 
 5
 When Beker refused to pay the amount due under this third contract, B & J filed a lien and sued to foreclose. Beker answered, asserting violation of the New Mexico contracting laws as a bar. Beker further alleged fraudulent collusion between its construction supervisor and B & J in the negotiation of the contract, and counterclaimed for recovery of moneys paid under the first two contracts alleging the same fraudulent collusion. The trial court held for B & J on its claim and against Beker on its counterclaim. Beker brought this appeal.
 
 
 6
 Beker contends that certain of the trial court's findings of fact are clearly erroneous, either because they result from incorrect perceptions of the law of fraud, or because they are unsupported by the evidence. The core of Beker's fraud claim is its evidence that B & J paid at least $11,000 directly to the construction supervisor who acted for Beker in negotiations for all three contracts. Beker claims these payments compromised the supervisor's loyalty and business judgment in B & J's favor. Beker seeks to draw additional inferences of fraud from the duplicate payments for work on removing the converter and from the supervisor's direction to the controller to pay the $85,000 within days of his leaving the company's employ. Beker also suggests some inference of fraud should be drawn from the contract prices themselves. After reviewing the record on these contentions, we are not left with the "definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).
 
 
 7
 Although there was disputed evidence as to whether the payments to Beker's supervisor were "finder's fees" for tips on jobs with other firms, there is no other evidence to support a finding of fraud. On the other hand, the record supports an inference that the weight of the converter was misrepresented by Beker and that B & J substantially performed its first contract to remove the converter before the true weight was discovered. The record indicates that Beker's controller was aware of this and the consequent requirement that B & J perform the removal with different materials and methods. It further indicates that B & J's records were examined before the "duplicate" payments were authorized. The prices involved were not such as to compel a finding of fraud.[3] The record establishes that Beker's misrepresentation of weight excused further performance under the initial fixed sum contract and that Beker agreed to pay both the fixed sum and the cost plus five percent in order to have the work completed.
 
 
 8
 Beker's claim that the action on the third contract is barred by New Mexico law is not supported by the facts or the New Mexico cases. In support of his contention, Beker refers to N.M.Stat.Ann. §§ 67-35-1 to 67-35-63 (1953), which requires certain contractors to be licensed. But the testimony at trial showed that Beker initiated changes in the form of the third contract in order to take it out from under the licensing statute. The trial court concluded that the revised contract was a rental and consulting contract, and therefore exempt from the statute. It also found that Beker waived the provisions of N.M.Stat.Ann. §§ 67-35-1 to 67-35-63 (1953). In light of the testimony at trial, we cannot say that these findings are clearly erroneous. Furthermore, the New Mexico Supreme Court has held that where, as here, the unlicensed party has fully and satisfactorily performed, the other party may not "use the statute as a shield against paying a just obligation." Olivas v. Sibco, Inc., 87 N.M. 488, 535 P.2d 1339, 1340 (1975).
 
 
 9
 Beker also argues that B & J had contractually waived its right to file a lien against Beker's property. This argument was neither pleaded, briefed nor tried. It was first introduced by way of a post-trial motion to amend the pleadings to conform to the proof under Federal Rule of Civil Procedure 15(b), after all the evidence had been presented. The trial court did not abuse its discretion in refusing to allow the issue to be interjected at that stage. Since it was not properly before the trial court, it is not properly before us.
 
 
 10
 Beker also challenges the trial court's award of attorney's fees under N.M.Stat.Ann. § 61-2-13 (1953), which grants such fees to successful lien claimants. Beker alleges that the section applies only to actions brought in the state court. We think this issue is controlled by the principles set out in Alyeska Pipeline Serv. Co. v. Wilderness Soc'y :
 
 
 11
 (I)n an ordinary diversity case where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed. . . . (I)t is clear that it is the policy of the state to allow plaintiffs to recover an attorney's fee in certain cases, and it has made that policy effective by making the allowance of the fee mandatory on its courts in those cases. It would be at least anomalous if this policy could be thwarted and the right so plainly given destroyed by removal of the cause to the federal courts.
 
 
 12
 421 U.S. 240, 259 n.31, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975) (quoting from 6 Moore's Federal Practice P 54.77(2) (2d ed. 1974) and Sioux County v. National Surety Co., 276 U.S. 238, 243, 48 S.Ct. 239, 72 L.Ed. 547 (1928)). See Measday v. Sweazea, 78 N.M. 781, 438 P.2d 525, 530 (Ct.App.1968) (demonstrates state policy to allow fees to lien claimants).
 
 THE DELTAK CASE
 
 13
 This dispute arose in the context of substantial shortages in steel supplies during the summer of 1974. At that time Deltak contracted to design and fabricate a heat recovery boiler to be installed in a Beker plant then under construction in New Mexico. During the contract negotiations, Deltak subcontracted its fabrication and steel purchase responsibilities to Lasker Boiler Works, which had located a potential source of boiler plate steel and had placed an order at a fixed price. Subsequently, however, Lasker's potential source of supply indicated that it could not supply the plate in the near future. Lasker was unaware of an alternate source of supply.
 
 
 14
 In the latter part of October 1974, Deltak informed Beker of the complete lack of progress on the boiler fabrication. Beker quickly found available boiler plate at a cost substantially greater than Lasker's original subcontract price and offered the same to Lasker if it would run its shop on augmented work days to speed fabrication. Lasker refused to increase operations because of scheduling conflicts. Beker thereafter authorized Deltak to pay Lasker its costs to date and to rescind the Lasker subcontract. Beker then directed the transfer of all materials from Lasker to Holman Boiler Works which Beker employed to perform the fabrication on an increased production schedule. Deltak inspected and supervised Holman's work as the contract with Beker required.
 
 
 15
 Because of the increased steel costs and Holman's charges for fabrication, the eventual cost of the boiler was considerably in excess of the original contract price. Beker ultimately refused to pay Deltak $19,795 remaining on the contract price, alleging the increased cost as a setoff. Deltak then filed a lien, prompting its joinder as a defendant in B & J's action. Upon being joined, Deltak cross-claimed against Beker for $19,795. Beker denied liability and asserted its own cross-claim against Deltak for breach of contract for failure to deliver the boiler by November 1, 1974. Beker sought recovery of the sums it expended in excess of the original contract price. The trial court sustained Deltak's cross-claim and denied Beker's. Beker appeals.
 
 
 16
 Two contract clauses govern the resolution of this dispute. The first provides:
 
 Delivery:
 
 17
 Based on the Availability of material and present shop conditions, we (Deltak) Estimate that the equipment described in this proposal can be shipped in Approximately 160 days after receipt of order and approved drawings.
 
 
 18
 Record, vol. 4, at 435 (emphasis added). The second provides:
 
 
 19
 In case of changes or cancellation of order (by Beker), (Beker) will be charged for all costs caused by the changes or cancellation.
 
 
 20
 Record, vol. 4, at 435.
 
 
 21
 Beker's basic claim is that the first clause establishes a guaranteed delivery date. Since the delivery clause on its face obviously did not provide a guaranteed date, Beker sought to establish its theory by parol evidence. The trial court viewed the contract as integrated and unambiguous. It refused to permit the evidence for purposes of varying the terms of the contract but agreed to hear it for the limited purpose of defining "present shop conditions" and "availability of materials." The parol evidence does indeed show that November 1, 1974 was a critical date for Beker. But admission of the evidence would not have compelled a contrary result. The evidence reinforces the trial court's view of the written contract because it shows that the conditional provisions of the delivery clause were employed with full knowledge of the fact that November 1 was important to Beker. The parol evidence indicates that Deltak was unwilling to assume liability for the unstable steel supply market or for changes which the contract might impose on the fabricator's shop schedule. The clause unambiguously protected Deltak against precisely the contingencies that occurred. The trial court's determination that failure to deliver by November 1 was not a breach of the contract is adequately supported by the record.
 
 
 22
 The record also supports the trial court's rejection of Beker's claim that the increased cost of steel and fabrication was Deltak's liability. Deltak had contractually protected itself on steel and fabrication costs by simultaneously entering a subcontract for those items with Lasker. When Beker directed Deltak to cancel that subcontract and elected to purchase steel and fabrication at a higher price, it assumed all the additional costs under the changes and cancellation clause set out above.
 
 
 23
 Since we have concluded that the trial court did not err in holding there was no breach of the contract and that the cost of changes and cancellations was the contractual liability of Beker, there is no necessity for us to determine whether the force majeure clause excused performance. Our conclusions also preclude consideration of the trial court's refusal to apply the "cover" provisions of New Mexico's Uniform Commercial Code, N.M.Stat.Ann. § 50A-2-712 (1953).
 
 
 24
 Our discussion of the trial court's award of attorney's fees in the B & J case is equally applicable to this case.
 
 
 25
 We affirm the District Court's decisions in both the B & J and Deltak cases. Both cases are remanded for further proceedings consistent with this opinion.
 
 
 
 *
 Of the United States District Court for the District of New Mexico, sitting by designation
 
 
 [1]
 There was a dispute as to whether Beker had informed B & J that the weight of the converter was 360 tons. Beker contends that such a representation was made. The record supports the trial court's resolution of this dispute in B & J's favor
 
 
 [2]
 This included the costs for removing the converter with new rigging equipment and techniques
 
 
 [3]
 There was evidence that the cost plus five percent figure was well below the going rate. The $85,000 was within the range established by the testimony. So was the price of the third contract