## Lawrence County v. American Federation of State, County and Municipal Employees, AFL-CIO, District Council 85

*Charles W. Gaskett*, for plaintiff.
*Alaine S. Williams*, for defendant.

CAIAZZA, *J.*, October 13, 1982—This case is before the court on a labor arbitration award appeal. Here, the petitioner is the County of Lawrence which is a public employer pursuant to the terms designated in Section 301(1) of the Public Employe Relations Act, Act of July 23, 1970, P.L. 563, No. 195, as amended, 43 P.S. §1101.301, referred to as "Act 195" hereafter. Respondent, American Federation of State, County and Municipal Employees. District Council 85, referred to as "AFSCME" hereafter, is the certified bargaining agent of certain employees of the County of Lawrence. AFSCME exists as an employee organization under Section 301(3) of Act 195.

The facts here are recounted as follows:

An employee of the County of Lawrence, Dan DeNardis filed a grievance against the petitioner complaining of a violation of Article XXIV of the negotiated collective bargaining agreement, asserting that he was discharged without just cause.

"Here, the grievant was a bargaining unit private sector coordinator with Lawrence County.

In his Program Coordinator job, the grievant is shown to have had general responsibilities (1) to procure On-The-Job-Training Contracts (2) to coordinate classroom and/or other employment training and (3) to organize and work with a Private Industry Council, of business, industry, labor and community representatives — for promotion and development of CETA programs in and of the County. County of Lawrence v. American Federation of

State, County and Municipal Employees, AFL-CIO, District Council 85, Lab. Arb., September 11, 1981, p.3 (Long, Arb.).

Apparently, the grievant here was involved with the Lawrence County chapter of the Junior Chamber of Commerce (Jaycees). He maintained an active membership in that organization. "His Jaycee association and participation in its activities had resulted from efforts to establish and maintain contacts believed to be helpful in the promotion of CETA Programs." (Opinion and Award of Arbitrator, p.2).

Also, the opinion of the arbitrator states categorically that the record evidences the fact that the grievant wrote and issued letters related to his Jaycee activities from his county office and, in doing so, used a county postage meter in mailing communications for Jaycee programs. "When two (2) such letters had been returned, for "insufficient address" reasons, they had been opened by the CETA, Office Manager, who, promptly, had turned them over to its Executive Director — on Friday, February 20, 1981."
(Opinion and Award of arbitrator, p.4).

The executive director subsequently submitted a written report to the county commissioners recounting the facts and stating:

"I examined the letters and discovered they contained material related to the New Castle Jaycees Outstanding Farmer Award. The letters are signed by [Grievant], 1981 OYF Chairman. This material is not CETA related material and should not have been mailed with CETA or County funds. The postage meter number of the two letters coincides with the postage meter number listed on the letter I received from the Commissioner's office on Friday, February 20, 1981.

"Mr. Walter J. Kosior [EEO Director] observed [Grievant] doing Jaycees related work on February 13, 1981 at his desk — a letter from Mr. Kosier is attached.

"At approximately 2:15 P.M. on Friday, February 20, 1981, IMU Coordinator Cathy McKissick asked me if there was something that could be done to prevent staff members from using our mailing system for non-CETA related business. Miss McKissick then informed me that her brother received a letter from [Grievant] about the Outstanding Young Farmer Award. (Opinion and Award of Arbitrator, p. 4, 5)."

Bottomed upon these facts, the grievant was terminated from his position on March 3, 1981. On March 29, 1981, a grievance was filed; the issue was appealed to arbitration pursuant to Article XXIII, Section 5 of the negotiated labor agreement. A hearing was held on July 21, 1981.

The gravaman of the grievance was that the employer violated Article XVIV of the bargaining agreement by discharging the grievant without just cause. The union requested that the grievant be reinstated and made whole for all lost wages, for lost seniority and for collateral benefits lost by reason of the discharge.

On September 11, 1981, the arbitrator entered the following award:

The grievance is sustained, to the limited extent of the Findings therein. The challenged discharge penalty will be set aside — in favor of an extended "suspension" penalty to the date of the Award herein. Requested "back pay" and "apology" remedies are denied, as unwarranted, however, under the Parties Agreement. (Opinion and Award of Arbitrator, p.14).

Again, the court is called upon to decide whether

the award of the arbitrator can be derived from the essence of the agreement. The essence test can be defined as follows:

"To state the matter more precisely, where a task of an arbitrator, PERA or otherwise, has been to determine the intention of the contracting parties as evidenced by their collective bargaining agreement and the circumstances surrounding its execution, then the arbitrator's award is based on a resolution of a question of fact and is to be respected by the Judiciary if 'the interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and other indicia of the parties' intention . . . .' " Community College of Beaver County v. Community College of Beaver County, Society of the Faculty, 473 Pa. at 593, citing Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1128 (3d Cir. 1969).

In the Steelworker's Triology[1] the function of labor management arbitration was clearly defined. In United States Steelworkers of America v. American Mfg. Co., 363 U.S. 564 (1960), the Supreme Court of the United States criticized the lower court's "preoccupation with ordinary contract law." 362 U.S. at 567. The court said, "[W]hether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for . . . ." And also, in United Steelworkers of America

---

1. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564 (1960); United Steelworkers of America v. Warrior and Gulf Navigation Co., 363 U.S. 574 (1960); United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593 (1960).

v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960), the court pointed out that "[T]he collective bargaining agreement governs a whole employment relationship. It calls into being a new common law—the common law of a particular industry . . . [A] collective bargaining agreement is an effort to erect a system of industrial self-government." (Citations omitted). 363 U.S. at 578-9. And, "[T]he labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment." Id at 581-2.

It is decidedly obvious that the interpretation of the collective bargaining agreement is a question which is to be for the arbitrator. Throughout the cases the same theme is paramount—it is the arbitrator's construction which was bargained for by the parties. Supposedly, and hopefully, the arbitrator is familiar with the customs and practices of the workplace. There is good reason, then, for the court not substituting its view and interpretation of the contract in place of the view of the arbitrator. Again, the collective bargaining agreement encompasses a wider area than the normal contract in that its purpose is to govern a legion of situations which the draftsmen could not forestall; and it is precisely those situations which call upon the expertise of the arbitrator.

Here, the arbitrator defined "just cause" under the terms and provisions of the collective bargaining. To disturb his interpretation of "just cause" by this court would exceed the bounds of judicial review.

Finding this matter in its present posture, the court has no alternative but to affirm the arbitrator's award since our review must end once the issue, properly defined, is found to be within the terms of

the negotiated agreement. See Leechburg Area School District v. Dale, et al., 482 Pa. 515, 424 A.2d 1309 (1981).

Regarding the respondent's claim for damages for delay, costs and attorney fees, this court recognizes the original case involving the payment of attorney fees, i.e., Alyeska Pipeline Co. v. Wilderness Society, 421 U.S. 240 (1975) in which the United States Supreme Court enunciated the equitable rule entitling a successful litigant to attorney fees. "[W]hen the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . ." 421 U.S., supra at 258-59. However, the fact that the County did not prevail in the case sub judice does not mean, that, of itself, the conduct of the County of Lawrence was vexatious or wanton. Even if such situations when either the law or the facts appear questionable or even unfavorable at the outset of the proceedings, the party seeking review may have entirely reasonable ground for bringing suit.

As was stated in Christianburg Garment Co. v. Equal Employment Opportunity Commission, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed. 2d 648 (1978).

"[I]t is important for the District Court to resist the understandable temptation to engage in post hoc reasoning by concluding that because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic discourage all but the most airtight claims . . . ." 434 U.S. at 421-22, 98 S.Ct. at 700.

Furthermore, it is this type of deterrent that the courts have attempted to shield in cases soliciting the payment of attorney fees by the losing party. Consequently, the court here cannot draw the conclusion that the county's conduct was in fact vexatious or wanton simply because the appeal did not

substantively address the question of the arbitrator's jurisdiction, as suggested in International Association of Machinists and Aerospace Workers District 776 v. Texas Steel Co., 639 F.2d 279 (5th Cir. 1981). (Hereafter, Texas Steel I).

Absent the dilatory history as presented by the factual situation in Texas Steel I, to limit the objection of the county to the question of jurisdiction would only deny judicial inquiry into the two legitimate areas in which the courts of the Commonwealth have rightful concern, viz., (1) did the parties enter into an agreement to arbitrate and (2) does the dispute fall within the arbitration clause. Carmichaels Area School District v. Carmichaels Area Education Association, 37 Pa. Commw. 141, 389 A.2d 1203 (1978) affirmed 487 Pa. 15, 407 A.2d 382 (1979). Nor, can the county's conduct here be equated with wanton or vexatious behavior as required by Alyeska Pipeline, supra.

Notably also is the Act of April 28, 1978, P.L. 202, No. 53, §10(12) as amended December 5, 1980, No. 189, §2 (42 Pa. C.S.A. §933(b) governing appeals from awards of arbitration wherein no language appears limiting raised objections to the arbitrator's jurisdiction.

## ORDER OF COURT

Now, October 13, 1982, in accordance with the opinion filed herewith, the arbitrator's award dated September 11, 1981, is hereby affirmed.

Respondent's claim for damages for delay, costs and attorney fees is denied.