49 F.3d 213
 Fed. Sec. L. Rep. P 98,659
Guy P. WYSER-PRATTE, Plaintiff-Appellant,
v.
VAN DORN COMPANY, B.T.Z. Inc., as Representative of the
Class of Shareholders in Van Dorn Co., and Crown
Cork & Seal Co., Inc., Defendants-Appellees.
 No. 93-4262.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 29, 1994.
Decided March 8, 1995.
 
 C. Reynolds Keller, Jr. (argued and briefed), Hahn, Loeser & Parks, Cleveland, OH, for plaintiff-appellant.
 Keith L. Carson (argued and briefed), Thompson, Hine & Flory, Cleveland, OH, for Van Dorn Co., B.T.Z. Inc.
 Mark A. Klugheit, Steven B. Feirson (briefed), Arthur Newbold (argued), Dechert, Price & Rhoads, Philadelphia, PA, for Crown Cork & Seal Co., Inc.
 Before: KEITH, NELSON, and LAY*, Circuit Judges.
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 Plaintiff Guy P. Wyser-Pratte, a risk arbitrageur, solicited proxies from shareholders of Van Dorn Company in connection with proposals designed to encourage a sale of the company. In his proxy materials he said that he and his associates were paying the solicitation costs. He subsequently indicated that at the time the materials were prepared it was his intent to seek reimbursement of such costs if the company were sold at a price beneficial to the shareholders. This intent was not disclosed in the proxy materials.
 
 
 2
 Van Dorn ultimately agreed to be acquired by Crown Cork & Seal Co. Wyser-Pratte then sued Van Dorn and a purported representative of its shareholders for recovery of proxy solicitation costs, including legal fees. The action was brought (under Ohio law) in the United States District Court for the Northern District of Ohio. The court had diversity jurisdiction under 28 U.S.C. Sec. 1332(a).
 
 
 3
 Crown Cork was joined as a defendant just before a certificate of merger was filed with the Ohio Secretary of State. Denying a motion for a preliminary injunction that would have required Crown Cork to place part of the purchase price in escrow, the district court allowed the full price to be distributed to the Van Dorn shareholders.
 
 
 4
 Wyser-Pratte sought recovery under three separate theories: quantum meruit, shareholder ratification, and an expanded version of the "common fund" doctrine. The district court rejected each of these theories and granted summary judgment to the defendants.
 
 
 5
 Wyser-Pratte presses only his common fund theory on appeal. He acknowledges that the common fund doctrine has heretofore been applied only to allow recovery of litigation expenses, but he argues that the doctrine ought to be expanded to cover the costs of a proxy contest undertaken as an alternative to litigation.
 
 
 6
 We find it unnecessary to decide whether there are circumstances under which an expanded common fund theory might be tenable under Ohio law. In the circumstances of this case, we conclude, an Ohio court of equity would be unlikely to allow recovery of the plaintiff's proxy solicitation costs in any event. We shall affirm the judgment of the district court on that basis.
 
 
 7
 * Van Dorn is an Ohio corporation that used to have its headquarters in a town called, appropriately enough, Independence. Van Dorn's common stock, of which some 8.3 million shares were outstanding at the beginning of 1992, was traded on the New York Stock Exchange. The company had more than 3,300 shareholders.
 
 
 8
 On January 7, 1992, Crown Cork publicly offered to buy Van Dorn for a package consisting of cash and shares of Crown Cork stock. The package was valued at $18 per share. Van Dorn's stock had previously traded in the $12 range, but the market price rose when the offer was announced.
 
 
 9
 Van Dorn's Board of Directors rejected the offer. On February 6, 1992, following the rejection, Crown Cork increased its offer to $20 per share. The sweetened offer was rejected as well, after which the market price of the stock fell from about $19 per share to about $14.
 
 
 10
 Mr. Wyser-Pratte, a New York resident, owned 5,000 shares of stock in Van Dorn.[1] After the second offer was rejected Mr. Wyser-Pratte sent a letter to the chief executive officer of Van Dorn asking that a special meeting of shareholders be called to consider certain "corporate governance" measures. These measures--the nature of which was not specified in the letter--were presumably intended to encourage a sale of the company. Four separate lawsuits were filed by shareholders seeking to compel a sale, but Wyser-Pratte did not participate in that litigation.
 
 
 11
 Mr. Wyser-Pratte made arrangements with a New York partnership, Spear, Leeds & Kellogg, to share the cost of initiatives to be taken with respect to a special meeting. Spear Leeds, according to a filing made with the Securities and Exchange Commission on March 3, 1992, owned 285,000 shares of Van Dorn stock.
 
 
 12
 On April 23, 1992, Mr. Wyser-Pratte and his company sent a general solicitation to Van Dorn's shareholders urging them not to vote for the people whom the company was nominating for election to directors' positions at the next annual meeting. The solicitation letter (which, among other things, described Wyser-Pratte's efforts to obtain a special meeting of the shareholders) estimated the total costs associated with the solicitation at $15,000. This cost, the shareholders were told, "is being borne solely by Wyser-Pratte and Wyser-Pratte & Co."
 
 
 13
 On August 7, 1992, Van Dorn called a special meeting of the shareholders to vote on Wyser-Pratte's corporate governance proposals. On the previous day representatives of Wyser-Pratte had presented Van Dorn with a formal demand for such a meeting. The demand was supported by the holders of approximately 45 percent of the outstanding shares, well above the 25 percent required for that purpose under Van Dorn's bylaws.
 
 
 14
 On August 10, 1992, according to proxy materials subsequently filed by Wyser-Pratte, an investment group known as "Starpack" agreed to reimburse Wyser-Pratte for up to $100,000 of the costs incurred in connection with his solicitation of demands for the special meeting.
 
 
 15
 On September 10, 1992, Mr. Wyser-Pratte circulated proxy statements, a copy of which had been filed with the SEC, soliciting proxies in connection with the forthcoming special meeting. The proxy statement expressed Wyser-Pratte's view that rejection of the Crown Cork offer was not in the best interest of the shareholders. Recipients of the statement were urged to support proposals to
 
 
 16
 --require that all directors be elected annually rather than for staggered terms;
 
 
 17
 --recommend formation of a committee of independent directors to review acquisition proposals; and
 
 
 18
 --opt out of the Ohio Control Share Acquisition Act.
 
 
 19
 The September 10 proxy statement disclosed that Mr. Wyser-Pratte now owned 6,600 shares of the Van Dorn stock; that clients of Wyser-Pratte & Co. still held 262,000 shares; that another corporation headed by Mr. Wyser-Pratte was investment manager for a European arbitrage fund that owned 18,500 shares; that the holdings of the Spear Leeds partnership had increased to 400,000 shares; and that Starpack had agreed to reimburse Wyser-Pratte up to $100,000 of the costs incurred in soliciting demands for the special meeting. The proxy statement also included these representations:
 
 
 20
 "Wyser-Pratte and Wyser-Pratte & Co., on the one hand, and Spear Leeds, on the other hand, have agreed to share the costs and expenses incurred in connection with this solicitation. Costs incidental to this solicitation include expenditures for printing, postage, legal and related expenses and are expected to be approximately $200,000. The total costs incurred to date in connection with this solicitation are not in excess of $100,000. The total costs previously incurred in connection with the solicitation of demands for the call of the Special Meeting were $62,000."
 
 
 21
 In a competing proxy statement mailed by Van Dorn to its shareholders on September 10, 1992, Van Dorn summarized certain information from Wyser-Pratte's proxy materials. In so doing Van Dorn told its shareholders about Wyser-Pratte's cost-sharing and cost-reimbursement agreements with Spear Leeds and Starpack.
 
 
 22
 Mr. Wyser-Pratte obtained the proxies of "more than 50% of the shareholders of record," according to his affidavit. On September 29, 1992, a week before the date scheduled for the special meeting, Van Dorn announced that it had authorized its investment banking firm to solicit definitive proposals for the purchase of the company. Mr. Wyser-Pratte promptly agreed to a postponement of the special meeting.
 
 
 23
 On December 17, 1992, Van Dorn entered into an agreement under which the company would be acquired by Crown Cork, through an affiliate, for a combination of cash and stock worth a total of $21 per share. The aggregate purchase price was approximately $175 million, of which about $35 million was in cash.
 
 
 24
 In a supplemental affidavit executed on August 6, 1993, Mr. Wyser-Pratte made the following statement:
 
 
 25
 "At the time of the preparation of the Opposition Solicitation in April, 1992 and the Proxy Statement in [ ] September, 1992, I intended to seek reimbursement only if my efforts proved successful in conferring a benefit upon the shareholders. I decided to seek reimbursement when a benefit to shareholders of $55,000,000 was reasonably certain to occur."
 
 
 26
 As we have said, the fact that Mr. Wyser-Pratte intended all along to seek reimbursement of his proxy solicitation costs if his efforts proved successful was not disclosed in his proxy materials.
 
 
 27
 Mr. Wyser-Pratte asserts that the fees and other costs he incurred as a result of his efforts to promote the sale of Van Dorn came to a total of $499,282.30, which is far in excess of the figures given the shareholders. Van Dorn declined a request by Wyser-Pratte for reimbursement of these costs.
 
 II
 
 28
 Mr. Wyser-Pratte filed the present lawsuit on March 30, 1993, naming as defendants Van Dorn and B.T.Z., Inc. The latter corporation, which owned 100 shares of Van Dorn stock, was sued as a representative of Van Dorn's shareholders. Crown Cork was added as a new party defendant on April 15, 1993, one day before the filing of the certificate of merger with the Ohio Secretary of State.
 
 
 29
 On the same day that he filed his amended complaint naming Crown Cork as a defendant, Wyser-Pratte moved for a temporary restraining order and preliminary injunction directing Crown Cork and Van Dorn to place $2 million in escrow pending resolution of the reimbursement claims. In a brief accompanying his motion Wyser-Pratte told the court that the merger would entail a deposit of cash and shares of stock with Bankers Trust Co. as exchange agent; that Bankers Trust would be free to distribute the cash and shares to Van Dorn stockholders immediately; and that "[o]nce the aforesaid cash and shares are distributed to the thousands of Van Dorn shareholders, Plaintiff will forever irreparably lose [his] only remedy [under his common fund claim.]" The district court heard oral arguments on April 20, 1993. Counsel for Wyser-Pratte reiterated during his argument that if Bankers Trust were to distribute all of the cash and stock deposited with it, the plaintiff "will have no fund...."The district court denied the injunction, announcing its ruling from the bench at the conclusion of the argument. The court did not take issue with the proposition that the threatened distribution of the fund would constitute irreparable injury, but concluded that Wyser-Pratte had not shown a substantial likelihood of success on the merits.
 
 
 30
 Mr. Wyser-Pratte did not appeal from the denial of the injunction, and we take it that Bankers Trust proceeded to distribute the full purchase price to the 3,300 Van Dorn shareholders. Van Dorn itself, we are informed, is now a subsidiary of Crown Cork.
 
 
 31
 Van Dorn and Crown Cork both moved to dismiss Wyser-Pratte's complaint, and the court gave notice that the motions would be dealt with as motions for summary judgment. On October 22, 1993, after full briefing, the court entered a memorandum and order granting the motions and discharging B.T.Z. as well. This appeal followed.
 
 III
 
 32
 Under the general "American rule," as the United States Supreme Court explained in Alyeska Pipeline Serv. Co. v. Wilderness Society, 421 U.S. 240, 245 and 247, 95 S.Ct. 1612, 1615 and 1616, 44 L.Ed.2d 141 (1975), "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." The parties have agreed that the case at bar is governed by Ohio law, and Ohio has long followed the American rule on attorney fees.
 
 
 33
 Like most American jurisdictions, Ohio recognizes that in class actions, at least, courts exercising equitable jurisdiction have discretion to grant attorney fees where a person "at his own expense, has maintained a successful suit for the preservation, protection, and increase of a common fund or common property, or ... has created at his own expense, or brought into court a fund in which others may share with him." Smith v. Kroeger, 138 Ohio St. 508, 515, 37 N.E.2d 45, 48 (1941), quoting 10 Ohio Jurisprudence 369, Sec. 258. In class actions, the Ohio Court held in the third paragraph of its syllabus in Smith v. Kroeger,
 
 
 34
 "a court exercising equitable jurisdiction may allow, in addition to costs between party and party, reasonable attorney fees ... to be paid out of the fund under the control of the court."
 
 
 35
 See also State ex rel. Montrie Nursing Home, Inc. v. Creasy, 5 Ohio St.3d 124, 127, 449 N.E.2d 763, 766-67 (1983), a class action where the Supreme Court reaffirmed the holding of Smith v. Kroeger.
 
 
 36
 As Mr. Wyser-Pratte concedes, the Ohio courts have never invoked the common fund theory to award attorney fees in a non-litigation context. The main argument offered by Wyser-Pratte for extending the theory to him as a non-litigant is that the shareholders of Van Dorn benefited from his efforts just as if he had forced a sale by bringing a lawsuit--and courts, he says, should encourage people to conduct their business without resort to litigation. The main argument offered against extending the common fund doctrine beyond its historical limits is that courts would often find it difficult or impossible to tell what role the claimant's actions really played in creating the fund--and far from discouraging litigation, extension of the doctrine would provide an incentive for the filing of more suits like this one. There is enough takeover litigation as it is, the defendant suggests, without creating a brand new type of satellite litigation.
 
 
 37
 Although we doubt that the Ohio Supreme Court would be very receptive to an extension of the common fund theory even under the best of circumstances, we need not decide that question here. The circumstances of the instant case are far from optimal, from the plaintiff's standpoint, and we would see no abuse of discretion in this case even if we thought that an extension of the common fund doctrine might be viable under other circumstances.
 
 
 38
 As the district court pointed out in denying Mr. Wyser-Pratte's quantum meruit claim, "[p]laintiff expressly told shareholders that he would pay his own costs." The parties disagree as to whether the rules of the SEC required Mr. Wyser-Pratte to disclose in his proxy materials that he intended to seek reimbursement if Van Dorn were sold at an advantageous price, but that too is an issue we need not decide. Any award of fees and expenses on a common fund theory would entail an exercise of the district court's equitable powers. As a matter of equity, we believe, regardless of what the SEC rules may have required, it was incumbent on Wyser-Pratte to disclose his intent to seek reimbursement.
 
 
 39
 "Equity will not aid a volunteer," as the maxim puts it. Mr. Wyser-Pratte was acting as a volunteer, and the recipients of his proxy solicitations were given no reason to believe that they might ultimately be required to help pay his solicitation costs. The district court clearly did not abuse its discretion in deciding to let the costs lie where they fell.
 
 
 40
 Under Ohio law, moreover, "any attorney's fees must come from the fund itself and may not be assessed against [a party] in the absence of some exceptional conduct on [the party's] part which would justify the imposition of attorney's fees as costs or damages." Creasy, 5 Ohio St.3d at 127, 449 N.E.2d at 766-67. A footnote following this passage in Creasy cites cases involving bad faith and civil contempt. Crown Cork, on which Mr. Wyser-Pratte would have us impose the burden of underwriting his expenditures for legal fees and other costs, was clearly not guilty of bad faith, contempt, or any other "exceptional conduct" that might justify awarding damages against Crown Cork after the fund had been distributed.
 
 
 41
 It is true that Crown Cork did not instruct Bankers Trust to establish an escrow fund out of part of the monies or shares deposited with it for distribution to the Van Dorn shareholders. Wyser-Pratte, however, points to nothing in the merger agreement that would authorize Crown Cork to do so. Wyser-Pratte tried to get the district court to order a partial holdback pending resolution of the reimbursement claims,[2] but the court decided not to do so. Wyser-Pratte could have appealed that decision, but no appeal was taken. It is not inequitable to require Wyser-Pratte to live with the results of his failure to appeal, now that the fund is no more.
 
 
 42
 In O'Neill v. Church's Fried Chicken, Inc., 910 F.2d 263 (5th Cir.1990), the defendant corporation was sued by a stockholder for improperly opposing a tender offer. The corporation withdrew its opposition as a result of the lawsuit. After the takeover had been completed and the shareholders had been paid, a federal district court in Texas awarded fees and expenses to the plaintiff stockholder. The Court of Appeals affirmed the award, and Wyser-Pratte relies on that decision in arguing here--contrary to the argument he made when seeking a preliminary injunction in the district court--that disbursement of the common fund to the shareholders does not preclude a fee award under the common fund doctrine. We are not persuaded.
 
 
 43
 Texas law, which governed the claim in O'Neill, teaches that "shareholders who pursue a successful derivative suit [are allowed] to recover their attorneys' fees from the corporation if they show that they have conferred a substantial benefit to the corporation through their efforts." Id. at 265. It was on this basis that the Court of Appeals approved the award in O'Neill. The defendant did not argue there that the claim for attorney fees died because the stockholders had been paid, and the Court of Appeals had no occasion to consider that proposition.
 
 
 44
 In the case at bar Wyser-Pratte did not pursue a successful "derivative" suit, so he is forced to rely on the common fund doctrine pure and simple. Under that doctrine, the Ohio Supreme Court has said in the plainest of terms, "any attorney's fee must come from the fund itself...." Creasy, 5 Ohio St.3d at 127, 449 N.E.2d at 766-67. If O'Neill is inconsistent with Creasy--and we do not mean to suggest that it is--we are obliged to follow the Ohio case rather than the Texas case.
 
 
 45
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Donald P. Lay, United States Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 In an affidavit filed with the district court on April 19, 1993, Wyser-Pratte said that he was a shareholder of Van Dorn at the time of Crown Cork's initial proposals. In a solicitation to Van Dorn shareholders dated April 23, 1992, however, Wyser-Pratte disclosed that he had purchased his shares on February 12, 1992. The solicitation also disclosed that Wyser-Pratte & Co., a money management and risk arbitrage firm of which Mr. Wyser-Pratte was president, held 262,000 shares of Van Dorn stock in client accounts
 
 
 [2]
 Wyser-Pratte wanted the court to order that $2 million be held back--an amount four times the amount of the fees and other expenses being claimed. The discrepancy is accounted for in part by the fact that Wyser-Pratte sought an additional $1.1 million to compensate him for the benefit he claimed to have bestowed on Van Dorn and its shareholders. In Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157 (1882), the landmark federal case on the common fund doctrine, the Supreme Court refused to let claimants against a common fund be paid "a salary for their time...." Id. 105 U.S. at 538. In his appeal Wyser-Pratte does not press the claim for the additional $1.1 million